631 P.2d 1223
STATE of Idaho, Plaintiff-Respondent,

v.

James Q. ANDERSON,
Defendant-Appellant.

No. 12545.

Supreme Court of Idaho.

June 2, 1981.

Rehearing Denied Aug. 10, 1981.

Gary Dale DeMeyer, Middleton, for defendant-appellant.

David H. Leroy, Atty. Gen., Lance De-Wyn Churchill, Deputy Atty. Gen., Boise, for plaintiff-respondent.

McFADDEN, Justice.

This is an appeal from a judgment upon conviction of grand larceny of a bay work mare. Inasmuch as the basic challenge to the conviction questions the sufficiency of the record to sustain the verdict and conviction, a somewhat detailed statement of uncontroverted fact follows. The case involves two similar horses, both unbranded bay mares. Photographs of each of these horses were introduced into evidence, and the horses themselves will be referred to by means of these exhibits. Exhibit 1 is a "straight bay" mare with no white markings, approximately 1400 lbs., and is unbranded. Exhibit 4 is a "blood bay" (more reddish) mare, unbranded, about 1360 lbs., with some white markings of the face and legs.

Appellant and his wife lived on a ranch outside Marsing, Idaho, where they raised and bred horses and other livestock. Appellant also engaged in horse racing throughout the northwest. In May of 1975, while on the racing circuit, appellant purchased a bay mare at auction in Hermiston, Oregon. He had the horse immediately loaded into his trailer and set out for Marsing, some 300 miles distant. He arrived at his home around 2:30 in the morning, and released the mare into the pasture. He woke his wife, told her he brought a new horse back, and requested her to pack a lunch and to wake him after a couple of hours. Upon awakening, appellant left again for the racing circuit.

Appellant's wife noticed a bay mare, which she later identified as exhibit 1, in their pasture around 8:00 a. m. the following morning. Her husband had left by this time. This mare soon came into heat, and appellant was informed of this fact by tele-

phone. Appellant returned and had the mare bred to his own stud, a recurring practice over the summer. Appellant and his wife concluded in the fall that since the mare hadn't caught she must be barren and should be sold as opposed to keeping and feeding her over the coming winter. Accordingly, appellant sold the mare, exhibit 1, in late November 1975 to Rayne & Seal, livestock dealers in Nampa.

Approximately a week prior to this sale, appellant's neighbor, Mitch Quintana, was informed by his ranchhands that some mules and a couple of horses, including a bay work mare, were missing. Quintana called the appellant to see if some of the animals had strayed onto the appellant's property. Appellant's wife testified that such straying was a common occurrence over the summer while her husband was away due to the condition of the fence separating the Quintana and Anderson properties. Both appellant and his wife testified that they had on occasion taken animals back to Quintana's. Upon being called by Quintana, appellant stated that the mules and a mare were at his place; appellant later testified that he was referring to the mare, exhibit 4, at that time. Both appellant and his wife testified that this was the first time they had seen that mare on their property.

Quintana went to the appellant's ranch to recover his stock. Appellant attempted to return the mare, exhibit 4, to Quintana by driving it in with the mules. Quintana denied ownership of this mare, as did appellant. A discussion concerning another mare apparently took place but it is unclear exactly what was said. Quintana and his hand eventually left with the mules and another stray horse, leaving exhibit 4 at the appellant's.

Still looking for his missing horse, Quintana called Rayne & Seal, who informed him that they might have his mare. He went to the sale yard and identified the bay mare, exhibit 1, previously sold to Rayne & Seal by appellant as his own. Owyhee County Sheriff Nettleton was then called, and met with Quintana and Rayne at the yard.

The following day, Sheriff Nettleton, along with a state brand inspector, visited the appellant's ranch. Appellant informed them that he had a horse there that didn't belong to him, indicating the blood bay mare, exhibit 4. The sheriff and brand inspector then questioned appellant and his wife about the other mare, exhibit 1, sold to Rayne & Seal. Appellant stated that he had sold a bay mare to the dealer, and upon request, appellant's wife went into the house to get some documents concerning the horse and the sale. The appellant, his wife, the brand inspector and the sheriff later that day met at the Nampa sale yard where appellant identified the horse, exhibit 1, as the one he sold to Rayne.

Soon following these events, Rayne telephoned appellant and stated that the mare sold had been impounded or returned to Quintana, and that therefore he wanted the earlier payment made for the horse returned or other arrangements made to square the account. Appellant then loaded the blood bay mare, exhibit 4, into a trailer and took it to Rayne, who accepted it as a replacement for exhibit 1. Appellant testified that, though he always thought exhibit 1 was his mare, in light of the circumstances, including being told the straight bay mare was Quintana's, he took exhibit 4 as a "replacement," assuming it must have been his mare. In mid-December, 1975, Sheriff Nettleton arrested appellant on the charge of grand larceny for the sale of Quintana's mare, exhibit 1. See I.C. §§ 18–4601, 4604. After trial, the jury found appellant guilty and the court sentenced him to an indeterminate term not to exceed five years.

Appellant raises a number of issues on appeal, embodied therein being the contention that all necessary elements of the offense of grand larceny were not proven and the evidence thus is insufficient to support the verdict. The court agreeing with appellant on this score, the other arguments need not be addressed.

Larceny is a crime of specific intent, and this mental state is an element which must be proved beyond a reasonable doubt by the prosecution. I.C. §§ 18–114, 18–4601. This element was examined at length in the recent case of *State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977). An understanding of today's decision requires an awareness of the factual setting in that earlier grand larceny prosecution.

In *Erwin*, this court cast the issue presented as whether the evidence as a matter of law, beyond a reasonable doubt, warranted a jury finding that the defendant was possessed of the specific felonious intent required by law for a conviction on the charge of grand larceny. This court found the evidence there insufficient to prove the requisite intent and the conviction was reversed.

In *Erwin*, the defendant was a rancher whose operation bordered B.L.M. land upon which another rancher grazed his cattle by permit. Erwin's son drove two truckloads of cattle to auction, and, upon the sale of the animals, three were observed to be carrying the earmarks of the neighboring rancher. Apparently because of better forage, the Erwin property attracted the cattle from the B.L.M. land, and Erwin in the past had both returned strays and called the neighboring rancher to retrieve them. There also appeared to be fencing problems along the area where the B.L.M. land and the Erwin operation joined.

The Erwins explained at length during trial the process of culling, loading and transporting the cattle to auction. See 98 Idaho at 738, 572 P.2d 170. The end result was the extraction of a little more than 20% of the herd for sale, the culling and return of an additional 10% stray animals, and the final loading of the cattle after nightfall. The Erwins testified that occasionally strays were sent to market, and the brand commissioners agreed this was not an infrequent occurrence. Erwin also testified at trial of the possibility of mistakenly loading stray cattle—a mistake which he also had

admitted was possible when confronted by the brand inspectors at the auction yard and questioned as to the earmarked animals.

This court stated in *Erwin*,

"Larceny is a crime of specific intent. The burden of proving the requisite mental state beyond a reasonable doubt belongs to the prosecution. [citation omitted] Recent U. S. Supreme Court decisions make it clear that any attempt to shift that burden to the defendant is an error of constitutional dimensions. At most, the defendant can be made to bear the burden of producing enough evidence to justify a reasonable doubt on the issue. But once the question has been raised, it is the prosecution which must prove the requisite mental state beyond any reasonable doubt. [citations omitted] No other procedure is compatible with safeguarding the presumption of innocence, 'that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law." ' " 98 Idaho at 739–740.

While recognizing that intent may be proven by means of circumstantial evidence, the court reiterated the rule in *Erwin* that such evidence must not only be consistent with guilt, it must also be inconsistent with any reasonable theory of innocence. *Erwin, supra*, 98 Idaho at 740–41, 572 P.2d 170; *State v. Wilson*, 62 Idaho 282, 284, 111 P.2d 868 (1941); *State v. Marcoe*, 33 Idaho 284, 286, 193 P. 80 (1920). While the jury is the arbiter of the evidence, including the credibility of witnesses,

"at the same time, judicial review requires that we peruse that evidence to determine whether a reasonable mind would conclude that the defendant's guilt as to each material element of the offense was proven beyond a reasonable doubt. Here our concern is with the element of felonious intent, and if the evidence is such that reasonable jurors must necessarily have a reasonable doubt as to the proof of that element, we can not

allow the verdict to stand." *State v. Erwin*, 98 Idaho at 740, 572 P.2d 170.

Appellant here stated at trial that he purchased, at auction and without inspection, the first large brood mare he could since he needed breeding stock but had to return quickly to Idaho and then to the racing circuit. Appellant testified that the animals at auction were quickly paraded through the sale ring and that he bid on three or four animals before being successful in acquiring a mare appearing to weigh around 1300 pounds for an amount between $300 and $400. He had the mare immediately loaded into his trailer and set out for Marsing. He arrived in the middle of the night, placed the horse in his pasture, and went to bed only to arise after a few hours sleep and leave once again for the out-of-state horse racing circuit. His wife, informed that they had a new horse, found exhibit 1 next to their home the morning following appellant's return with the newly purchased mare.

Appellant and his wife fed this mare and treated it as their own, believing it to be their own, over the course of the summer. They had the animal bred during the season and decided to sell it only upon concluding that she was barren. Appellant and his wife testified that they had not seen the other mare, exhibit 4, until their neighbor came to recapture his strayed mules. Appellant at that time offered exhibit 4 to Quintana, believing it to be his neighbor's lost mare, and indeed attempted to drive it in with the mules for transportation back to Quintana's ranch.

Consistent with his belief, appellant sold exhibit 1 as his own. Only after being informed by the sheriff and brand inspector that the horse he sold belonged to someone else, and after being requested to settle his account with the livestock dealer, did appellant ever indicate that exhibit 4 might be his mare. He manifestly did so on the ground that if exhibit 1 was, in truth, not his horse, as he and his wife had believed, then exhibit 4 must have been his horse.

It appears from the record that the horses were similar enough in size and appearance that upon finding the mare at their home the morning following release and continually throughout the summer, appellant and his wife could reasonably believe that it was the mare he had purchased. Based upon Quintana's testimony that exhibit 1 was a "work horse," the state elicited testimony from various witnesses to the effect that work horses are generally heavier and of more solid build than "saddle horses." Here, however, the "saddle" horse, exhibit 4, was but 40 to 50 pounds lighter than exhibit 1 and was described as "chunky" in appearance. The differences in weight, color and marking were not so striking that a person with the limited knowledge of the horse possessed by appellant would necessarily have decided that he was feeding and breeding the wrong animal.

It is our conclusion that the circumstantial evidence presented was consistent with appellant's assertion that the sale of Quintana's horse was but a mistake. The prosecution is required to prove all elements beyond a reasonable doubt and here "the evidence is such that reasonable jurors must necessarily have a reasonable doubt as to the proof [of the element of specific larcenous intent]." *Erwin, supra*, 98 Idaho at 740, 572 P.2d 170. The explanation offered by appellant, embodying a reasonable theory of innocence consistent with the facts and circumstances of the case, cannot be ignored. *State v. Erwin, supra*; *State v. Wilson, supra*; *State v. Darrah*, 60 Idaho 479, 484–5, 92 P.2d 143 (1939); *State v. Marcoe, supra*; *State v. Seymour*, 7 Idaho 257, 61 P. 1033 (1900). There was necessarily reasonable doubt as to the element of felonious intent and the evidence therefore fails to sustain the verdict. Accordingly, the conviction is reversed.

BISTLINE, J., and SCOGGIN, J. Pro Tem., concur.

BISTLINE, Justice, specially concurring.

The opinion authored by Justice McFadden correctly disposes of the case on the

grounds of insufficiency of the evidence. Application of a recent United States Supreme Court case, *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), requires dismissal of the action, whereas were we to dismiss only for error in the instructions given to the jury, a second trial might result. In my view, however, where a jury verdict is being overturned, the public interest justifies an extra effort to explain how it appears the jury went awry.

Defendant on appeal challenged given jury Instruction No. 11, urging upon us that "mere possession of stolen property by the accused is not enough standing alone to let the jury draw the inference (of guilt) because the corpus delicti must be proved beyond a reasonable doubt first." Defendant's argument is soundly premised on case law made by this Court—which case law accords with the general rule of law of all jurisdictions.

Other than having been given jury Instruction No. 11,[1] any reasonable jury would not have convicted this defendant or any other person on such scant evidence.

In defense of the challenge to Instruction No. 11, the state resorts first to the technicality that the objection at trial registered to the instruction was insufficiently specific, and secondly, the state would have us accept its contention that "[I]n proving the corpus delicti, it is not necessary for the state to prove that an appellant has committed the crime." Such argument is untenable as applied to this case. The defendant here had in his possession a horse which turned out to be a horse though not of a different color, nonetheless a horse different from the one which he thought he possessed. His possession of the horse allegedly stolen was not in dispute. In dispute was whether he had stolen it—with which he was charged. There was in this case no evidence whatever that anyone made off with Quintana's horse in the sense of the statutory definition of larceny. There are cases where the actual larceny is observed and the identity of the perpetrators not known at that time, and there are other cases where circumstantial evidence establishes that a theft has taken place—leaving it only to determine the identity of the culprit. But this case fits neither category.

Nonetheless, the jury was instructed that if it found that the horse was stolen, and defendant was found in possession, it could draw the inference that the accused participated in some way in the theft of the horse. This was wrong, the error being in that it allowed the jury to find that the horse had been stolen—concerning which essential element there was *no* evidence!

I plow no new ground. In *State v. Sullivan*, 34 Idaho 68, 199 P. 647 (1921), a unani-

---

1. Instruction No. 11 reads as follows:

"Possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen.

"And possession of property recently stolen, if not satisfactorily explained, is also ordinarily a circumstance from which the jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew it was stolen property, but also participated in some way in the theft of the property.

"The term 'recently' is a relative term, and has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property, and all the facts and circumstances shown by the evidence in the case. The longer the period of time since the theft, the more doubtful becomes the inference which may reasonably be drawn from unexplained possession.

"If the jury should find beyond a reasonable doubt from the evidence in this case that the property admitted into evidence was stolen and that, while recently stolen, the property was in the possession of the accused, the jury would ordinarily be justified in drawing from those facts the inference, not only that the property was possessed by the accused with knowledge that the property was stolen, but also that the accused participated in some way in the theft of the property, unless possession of the recently-stolen property by the accused is explained to the satisfaction of the jury by other facts and circumstances in evidence in the case."

mous Court, in addition to relying upon the same statements in the Court's opinion excerpted from *State v. Seymour*, 7 Idaho 257, 61 P. 1033 (1900), also held even as to an unexplained possession that such "possession by one of goods belonging to another does not raise the presumption that a larceny has been committed, and that the possessor is a thief; additional evidence is necessary to establish the *corpus delicti*." 34 Idaho at 78, 199 P. at 651.

The Court in that case left no doubt as to the quality of the evidence necessary to establish the *corpus delicti*:

> "The rule laid down by the early English authorities, such as Lord Hale and Lord Stowell, that the *corpus delicti* must be proved by direct or positive testimony before the accused could be convicted of the offense charged has been somewhat modified by the later decisions, so that it is no longer required that direct and positive evidence is necessary to prove the *corpus delicti*. But the authorities still all hold that where the proof is made by circumstantial evidence, it must be established so as to positively exclude all uncertainty, and be sufficient to satisfy the understanding and conscience of the jury beyond a reasonable doubt; or, as expressed by many of the writers, 'The *corpus delicti* ought to be proved either by direct testimony or by presumptive evidence of the most cogent and irresistible kind.' (*State v. Williams*, 52 N.C. 446, 78 Am.Dec. 248, and note; *People v. Jones*, 31 Cal. 566.)" 34 Idaho at 74–75, 199 P. at 649.

A correct statement of the law is found in Corpus Juris Secundum:

> "An instruction relating to the presumption arising from the possession of property recently stolen should not be given where the evidence fails to show that the property found in the possession of accused was stolen, or when the taking is admitted by accused and the only question is his felonious intent in taking it or his ownership of it." 52A C.J.S. *Larceny*

§ 151 at 708–709 (1968) (footnotes omitted).

A similar statement is found in Am. Jur.2d, and properly predicated upon an Idaho case:

> "The unexplained possession by one person of goods belonging to another, while it may be sufficient, in connection with the other circumstances, to show that a larceny has been committed, is not of itself sufficient to prove that fact or to raise a presumption that a larceny has been committed and that the possessor is a thief. Additional evidence is necessary to establish the corpus delicti. Unless the jury are satisfied beyond a reasonable doubt that the offense has been committed, the unexplained recent possession of goods will not justify the conclusion that the person in whose possession they are found is the thief. The mere possession of goods which have been actually lost does not furnish any conclusive or prima facie proof of guilt or, of itself, raise the suspicion of guilt." 50 Am.Jur.2d *Larceny* § 156 at 339.

As to the trial court's reasons for not entering a dismissal for the insufficiency of the evidence to establish either that the crime of larceny had been committed or that the defendant had committed it, a ready explanation is at hand. Recent decisions of this Court practically mandated the giving of the type of the instruction here given, and letting the case go to the jury. Those recent decisions not only ignored *State v. Seymour, supra,* and *State v. Sullivan, supra,* but actually visited upon larceny defendants that their cases be submitted to juries improperly instructed as to the consequences of being found in possession of recently stolen property. I will not emburden our disposition of this case with that which I wrote in *State v. Owen*, 101 Idaho 632, 619 P.2d 787 (1980). I will mention, however, that in my research a thorough review of instructions given in recent larceny cases was made, and the instructions here given to the jury were generally as

fair to the defendant as any which I viewed—other than that No. 11 should not have been given. The point of the matter is that the Court in *Trowbridge*[2] seemingly mandated the giving of some type of such instruction in all larceny cases, and here the trial court obviously felt compelled to follow that mandate—but did so in a manner as extremely fair as could be done under the law announced by this Court. It will be noted that the trial court did not tell the jury that unexplained possession raised a *presumption* of guilt.

In that same vein I, as one member of the Court, am particularly gratified to observe from a perusal of the reporter's transcript that the trial judge ruled out any felony impeachment of defendant's testimony, doing so based on his own experience and ability, and far in advance of the 1978 amendment to Rule 43(b)(6) which followed shortly after the dissenting opinion in *State v. Palmer*, 98 Idaho 845, 547 P.2d 533 (1978).

SHEPARD, Justice, dissenting.

I was initially tempted to merely cite the dissenting opinion in *State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977). However, my sense of outrage at the majority's non-objective view of the record has overcome my inertia. Likewise, I am disturbed at the majority's failure to even consider *State v. Cysewski*, 101 Idaho 353, 612 P.2d 1200 (1980), a case heavily relied upon by the State, which is very similar in the facts and law to the case at bar and *Erwin*.

Implicit in the majority opinion is the thinly veiled belief that defendant-appellant Anderson was unjustly convicted. Perhaps that is founded on the belief that Owyhee County, where defendant lived and allegedly stole the horse, is primarily agricultural in nature with large numbers of cattle, sheep, horses and mules, wherein horse stealing is unpopular, and regarded as a serious crime. Such may be the case. On the other hand, the record demonstrates that while indeed defendant-appellant Anderson was unpopular (whether because of his prior criminal record or otherwise), one of Idaho's more experienced trial judges meticulously attempted to protect the rights of the defendant-appellant at trial. At the first trial setting, the defense was allowed a large number of challenges to jurors to the extent that the entire venire was exhausted. After a further venire was summoned, the trial judge promptly granted a defense motion for mistrial on the basis that some of that new venire may have heard statements made by bystanders outside the court room. Thereafter the trial court ordered a change of venue to Canyon County. Although defendant-appellant Anderson had a previous felony conviction record, the trial judge granted a defense motion in limine to prohibit the prosecution from mentioning such criminal record in its cross-examination of Anderson. In its instructions to the jury, the trial court gave what, in my opinion, were instructions highly favorable to the defendant.

There is absolutely no question but that defendant-appellant Anderson sold a certain bay mare. The only question is whether he did so under the mistaken belief that the animal belonged to him.

The evidence of the prosecution indicated clearly that the animal belonged to one Quintana, who owned land adjacent to that of Anderson. Both Quintana and his employee testified that the animal in question had been owned by Quintana for four or five years and had been continuously worked by Quintana's employees as a work horse drawing wagons in connection with Quintana's sheep business. The horse had been noted continuously on Quintana's land throughout the summer in question and up until approximately November 1st, at which

2. *State v. Trowbridge*, 97 Idaho 93, 540 P.2d 278 (1975), where the Court stated its approval of "presumption of guilt instructions" in prosecutions for larceny and burglary, but held the same inapplicable in prosecutions for receiving stolen property, in which latter class of cases only an inference instruction is permissible.

time it disappeared. During that period of time the bay mare grazed with and was followed by a band of Quintana's mules. After the animal disappeared the mules were noted on Anderson's land and Quintana went to investigate. He found the mules on Anderson's land, but did not find his bay mare. He conversed with Anderson and was offered another animal which was also a bay mare, but which had substantial white markings thereon, including rear white stockings and a blazed face. Quintana was emphatic in his testimony that *his* bay mare had not a spot of white on it. Highly significant in that conversation was the lack of any indication by Anderson that he had sold a bay mare only a few days prior.

Later Quintana was advised that his animal might be at the sales yard and lo and behold, when he arrived at the yard, he found his animal and was told that it had been sold by Anderson. The above facts were essentially the case of the prosecution. At the close of the prosecution's case, the defense moved for a directed verdict of acquittal, which motion was denied by the trial judge.

Thereafter the defendant Anderson and his wife testified on behalf of the defense. Their testimony indeed indicated that Anderson had bought an animal during the month of May. In my judgment, the documents indicating that sale are conclusive as to what type of animal was purchased for transport to Anderson's home in Owyhee County. Although Anderson was absent from his home during most of that summer, he did return for an attempt at breeding of a mare. The breeding charts maintained by his wife would indicate the horse that was the subject of the breeding attempt was a bay and white mare. What is highly significant is the testimony of Mrs. Anderson that during the entire summer she cared for and fed the animal which Anderson later sold. That testimony is, of course, in stark contrast and contradiction to the evidence of the State that that same animal was not

on the Anderson ranch, but was rather known to be on the Quintana ranch until approximately November 1.

The majority opinion sets forth one view of the evidence, i. e., "Appellant and his wife fed this mare [exhibit 1, the animal sold by Anderson and the subject of the larceny charge] and treated it as their own, believing it to be their own, over the course of the summer. They had the animal bred during the season and decided to sell it only upon concluding she was barren. * * * Consistent with his belief, appellant sold exhibit 1 as his own." Contrary to that testimony, as before noted, is the evidence of the prosecution that the animal was on the Quintana place.

A contrary view of the evidence and the inferences which might be drawn therefrom would be that Anderson did indeed buy an animal and deliver it to his ranch, feed, care for and attempt to breed that animal during the summer months. That during the summer months large numbers of Quintana's stock came upon the Anderson ranch and disrupted its operation, including mules killing some of Anderson's dairy goats and attempting to breed with Anderson's brood mares. That in early November when Quintana's mare, accompanied by mules, again invaded Anderson's ranch, he took the mare who was obviously the leader of the mules and sold it. When Anderson was arrested he and his wife fabricated the story of the mistake as to their ownership of the animal that was sold.

I make no judgment as to which version of the circumstances is correct. I believe that judgment was one to be made by the jury. I do not believe the jury was required to accept the defendant's version of the facts if other evidence, both testimonial and circumstantial, gave rise to legitimate inferences contradicting the defense version of the facts. Here I believe the prosecution's evidence, with the legitimate inferences to be drawn therefrom, directly contradicted the defense case and that the resolution of that conflict was for the jury.

This case then is not unlike *State v. Cysewski, supra.* There a number of cattle belonging to a neighbor Best had continually strayed onto Cysewski's land. He had continually contacted Best in an effort to alleviate the situation, but Best denied ownership of the cattle. Cysewski then brought an action in small claims court against Best by reason of the cattle straying onto the Cysewski land. Best successfully defended that action on the basis that the cattle did not belong to Best. In desperation, Cysewski finally took the cattle to a Spokane sales yard and sold them. Thereafter he was charged with the grand larceny of cattle *belonging to Best.* Following jury trial, he was convicted and upon appeal he contended that there was insufficient evidence upon which to base the verdict. This Court affirmed the conviction, pointing out that regardless of Cysewski's version of the facts, "there was significant disagreement between the State's and the defendant's accounts of the events leading up to the sale of the cattle." The Court there concluded, "It is not the function of this Court to weigh such evidence nor to place ourselves in the jury's position."

Although the *Cysewski* court distinguished *Erwin,* I suggest it is impossible to distinguish the instant case from *Cysewski.* One or more of those three decisions is erroneous.

I point out lastly that included in this trial court's instructions to the jury were the following:

"If you find that the evidence in this case is susceptible of two constructions or interpretations, each of which appear to you to be reasonable and one of which points to the guilt of a defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit a defendant's innocence, and reject that which points to his guilt."

\* \* \* \* \* \*

"Where an act of the defendant may be attributed to two motives, one criminal and the other innocent, the law ascribes it to that which is innocent. This presumption continues, and the burden of proving that the criminal motive is the true one rests upon the prosecution."

\* \* \* \* \* \*

"An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime."

\* \* \* \* \* \*

"To constitute the crime of larceny, the intent must have existed in the mind of the defendant at the time of the taking to permanently deprive the owner of his property."

\* \* \* \* \* \*

"You are instructed that in the crime of grand larceny of which the defendant is accused by the Information, the State must prove, beyond a reasonable doubt, that the property set forth in the Information was wilfully, knowingly, intentionally, unlawfully, and feloniously taken, stolen, and carried away by the defendant and that the property so taken, stolen and carried away by the said defendant was one of the animals described in instruction number ten."

\* \* \* \* \* \*

"It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence in the case warrant any inference which the law permits the jury to draw from possession of recently-stolen property. If any possession the accused may have had of recently-stolen property is consistent with innocence, the jury should acquit the accused. The above instruction concerning the possession of recently-stolen property is limited by the rule that to warrant an inference of guilt it must be shown that the possession is personal and it involves a distinct and conscious possession by the accused."

\* \* \* \* \* \*

"If you believe that the defendant took the mare involved in this action, under fair color of claim or title, honestly believing that he was its owner and had a right to its possession or a right to take it, even though he was mistaken in such belief, then you must acquit him."

\*    \*    \*    \*    \*    \*

"If you can reconcile the evidence before you upon any reasonable hypothesis consistent with the defendant's innocence, you must do so, and in that case, find the defendant not guilty. You cannot find the defendant guilty unless, from all the evidence, you believe him guilty beyond a reasonable doubt."

\*    \*    \*    \*    \*    \*

"You are instructed that before you can find a defendant guilty of the crime charged, based solely on circumstantial evidence, you must find beyond a reasonable doubt that the circumstances are consistent with guilt of the defendant, and inconsistent with his innocence, and incapable of explanation or any other reasonable hypothesis than that of guilt."

Following such instructions, the jury returned a unanimous verdict of guilt. I would affirm that verdict.

DONALDSON, J., concurs.