634 P.2d 435

STATE of Idaho, Plaintiff-Respondent,

v.

Inez Martinez YBARRA, Jr.,
Defendant-Appellant.

No. 13300.

Supreme Court of Idaho.

Sept. 22, 1981.

Richard D. Petersen, Burley, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BISTLINE, Justice.

Defendant-appellant Inez Ybarra appeals from a conviction for robbery. We affirm. A summary of the facts adduced at trial is as follows:

At 3:21 a. m. on December 15, 1978, the Overland Car Wash in Burley, Idaho, was robbed of approximately $30. The attendant and only eyewitness, Lucy Cole, stated there was one $10 bill, two $5's and some $1's. Cole described the robber as about 5′8″ and 180 lbs., wearing a ski mask and a blue ski parka (Ybarra is 5′9″ and weighs 215 lbs.). Cole stated that the robber said he was holding a gun in his pocket and that he had a Spanish accent.

Officer Mason had observed a car similar to Ybarra's driving in what he described as a "suspicious" manner about fifteen min-

utes prior to the robbery. The car was cruising below the speed limit on the back streets. About fifteen minutes after the robbery Mason again observed this car, this time parked next to a vacant lot, away from other vehicles in the area, and about two blocks from the car wash. Mason stated that the hood of the car was still warm, although it was very cold outside. Another officer in an unmarked car drove up and stayed to watch this vehicle, while Mason went to check on a pickup, with its engine running, a short distance away.[1] About five minutes later Ybarra, wearing a short-sleeved shirt without a jacket, walked up to the car, entered it and drove away. Mason then returned in his patrol car and pulled Ybarra over. Three unmarked units were also present at this time. The officers, with their guns drawn, ordered Ybarra out of the car and frisked him. When it was determined that he was not armed, he was questioned, primarily by Mason while the other officers receded from the scene.[2]

Ybarra, who was not given the *Miranda* warnings at this time, stated that he had been out with Janie Curiel and that she had just dropped him off. Ybarra also consented to a search of his car trunk and wallet. Nothing incriminating was found; he had $71 in his wallet—three $20's, a $10 and a $1. After supplying identification and information as to where he was staying, Ybarra was told that he could leave.

On further investigation, the police found a jacket thought to have been worn by the robber in a back yard a short distance from the car wash. The owner of the house there told the police that a man had knocked on his door at 3:42 a. m. and asked for "Jerry." The description he gave of that man matched Ybarra. Curiel, Ybarra's alibi witness, stated that she had not been with Ybarra that night, and that she had been in Pocatello with friends.

Later that morning the police went to the house where Ybarra was staying and asked

1. A woman carrying an infant entered the pickup, and the police concluded this was merely a domestic disturbance.

2. Another officer came to the scene after the stop and asked a few questions.

him to accompany them to the police station for questioning. He agreed to do so. At the station he was taken to an interview room and read his *Miranda* rights, which he waived. He then repeated the same statement he had made the night before. He was subsequently placed in a lineup. Cole, the attendant, stated that Ybarra most looked like the man who had robbed her and that his voice sounded like the voice of the robber. After the lineup, Ybarra was placed under arrest.

After a preliminary hearing and commitment to district court, Ybarra moved to suppress his statements and the identification by Cole. He also sought a reduction in bail. Both motions were denied. A jury found Ybarra guilty and he was sentenced to a term not to exceed fifteen years. He appeals, setting forth numerous assignments of error.

### I.

The first issue raised by Ybarra is whether the trial court erred in not lowering his bond prior to trial, and, as a corollary issue, whether the Idaho statutes on bond violate due process and equal protection by discriminating against indigents.

■ As to Ybarra's argument that the trial court erred in not lowering his bond, "[e]ven if the conditions of release imposed upon a defendant are unreasonable and excessive, the court is not deprived of jurisdiction nor does it affect the validity of the defendant's conviction." *Vigil v. State*, 563 P.2d 1344, 1346 n.1 (Wyo.1977). *See, e. g., United States v. Marx*, 485 F.2d 1179 (10th Cir.), cert. denied 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1973); *Balltrip v. People*, 401 P.2d 259 (Colo.1965). Moreover, the proper method of challenging a bond as excessive is through a petition for writ of habeas corpus to this Court, provided application has first been made to the trial court to reduce bond. *See, e. g.*, 8 Am.Jur.2d Bail and Recognizance § 58 (1980). Since we affirm Ybarra's conviction, the claim of trial court error in failing to lower Ybarra's bond is moot. *See generally State v. Christensen*, Idaho, 632 P.2d 676 (1981).

Secondly, as to Ybarra's attack on the constitutionality of Idaho's provisions for bail, Ybarra's basic argument is that "the Idaho statutes governing bail make no mention of indigency ... [and] [u]ntil Idaho courts make proper allowance for indigency status in setting bail, the setting of bail by Idaho courts will be unfairly oppressive to the poor." I.C.R. 46(c) governed admission to bail at the time of Ybarra's trial:[3]

"(c) TERMS. If the defendant is admitted to bail, the terms thereof shall be such as in the judgment of the magis-

---

**3.** Effective July 1, 1980, I.C.R. 46(a) controls admission to bail:

"Rule 46. Bail or release on own recognizance. —(a) Right to bail or release before conviction. A person arrested for an offense not punishable by death shall be admitted to bail or may be released upon his own recognizance at any time before sentencing. A person arrested for an offense punishable by death may be admitted to bail in the exercise of discretion by any magistrate or district court authorized by law to set bail. The determination of whether a person should be released upon his own recognizance or admitted to bail, and the determination of the amount and conditions of bail, if any, can be made after considering any of the following factors:

"(1) His employment status and history, and his financial condition.

"(2) The nature and extent of his family relationships.

"(3) His past and present residences.

"(4) His character and reputation.

"(5) The persons who agree to assist him in attending court at the proper time.

"(6) The nature of the current charge and any mitigating or aggravating factors that may bear on the likelihood of conviction and the possible penalty.

"(7) His prior criminal record, if any, and, if he has previously been released pending a trial or hearing, whether he appeared as required.

"(8) Any facts indicating the possibility of violations of law if he is released without restrictions.

"(9) Any other facts tending to indicate that he has strong ties to the community and is not likely to flee the jurisdiction.

"(10) What reasonable restrictions, conditions and prohibitions should be placed upon his activities, movements, associations and residences."

This rule also provides for consideration of financial condition. *See* I.C. § 19–2901 et seq., for general provisions on bail.

trate, court or justice will insure the presence of the defendant, having regard to the nature of circumstance of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail, the character of the defendant, and the policy against unreasonable detention of defendant's pending trial."

As can be seen, this rule does provide for consideration of a defendant's financial status in setting bail. We find no merit in Ybarra's argument.

## II.

The second issue raised by Ybarra is whether the trial court erred in not granting his motion to suppress his exculpatory statements to the police.[4] As to the statements he made at the initial stop, Ybarra argues that that questioning amounted to a custodial interrogation and that therefore the police were required to give him the *Miranda* warnings.

▮ The test for determining whether questioning is custodial or merely investigative is whether the person is in custody or is deprived of his freedom of action in any significant way. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. McCurdy,* 100 Idaho 683, 603 P.2d 1017 (1979); *People v. Arnold,* 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967); *State v. Costa,* 228 Kan. 308, 613 P.2d 1359 (1980); *State v. Harge,* 606 P.2d 1105 (N.M.App.1979). This test is an objective one based on the surrounding circumstances. *See United States v. Hall,* 421 F.2d 540 (2d Cir. 1969), cert. denied 397 U.S.

990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); *State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Campbell,* 607 P.2d 745 (Or.App.1979); *State v. Paz,* 572 P.2d 1036 (Or.App.1977). The fact that a gun is initially drawn is not controlling, as the officers are entitled to protect themselves. *Pace v. State,* 580 S.W.2d 689 (Ark.1979); *People v. Glover,* 270 Cal.App.2d 255, 75 Cal.Rptr. 629 (1969).[5]

In *Glover,* appellant Glover was pursued from the scene of the robbery by officer Neville. Glover ran to a parked car which appellant Roberson was attempting to start. Neville, gun in hand, stopped both appellants, and asked Roberson why he was parked there. Roberson gave an exculpatory statement, and the court held that the failure to give the *Miranda* warnings was not error:

"Roberson was not in custody, but only in temporary detention for interrogation as to the reason for his presence there. No probable cause as to him had arisen, when he gave his exculpatory statement.... In this period of temporary detention a warning under the *Miranda* formula was not required.... Such questioning was not more than preliminary investigation, not the process of interrogation which triggers the *Miranda* rules." 75 Cal.Rptr. at 631 (citations omitted).

▮ Here, although the officers stopped Ybarra in force, on discerning that Ybarra did not pose a threat the extra officers withdrew and Ybarra was simply asked basic investigatory questions. It was not un-

4. Since Ybarra's statements were properly admitted, Ybarra's argument that Curiel's statements should have been suppressed is of no avail.

5. The Court in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), stated the following:

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure,

even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (Footnote omitted.)

There is no question here that a seizure occurred. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The question is whether Ybarra was deprived of his freedom of action in a significant way so that *Miranda* warnings were required.

reasonable for the police to stop a car at 3:00 a. m. on the streets of Burley, Idaho, shortly after learning of an armed robbery, in order to ask basic investigatory questions. There was hardly any other traffic in the area. The questioning only lasted a few minutes and Ybarra freely left as soon as he had explained his presence and given basic identification information. It cannot be disputed that if one officer had stopped Ybarra and questioned him, this would have been merely investigative. We see no difference in the present case where four police cars were present, but withdrew as soon as it was determined that Ybarra posed no threat. The policemen were investigating an armed robbery which had just taken place, and had every right to insure their own safety. Admittedly a multitude of police cars and officers present a vastly more intimidating scenario, but an encounter with even one policeman will for most result in some degree of intimidation.

As stated in *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977):

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there had been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda*, by its terms was made applicable, and to which it is limited."

The test is whether Ybarra was deprived of his freedom of action in any *significant* way, and, given that the surplus of police withdrew and the questioning was of short duration and of a general investigatory nature, we are not persuaded that he was deprived of his freedom of action in a significant way.

Since Ybarra's initial statements were admissible, his argument that his subsequent statements should have been suppressed as fruit of the poisonous tree also fails. Ybarra also argues that his limited ability to understand English made his waiver of his rights invalid. The state has the burden of showing a knowing and intelligent waiver. *See State v. Shannon*, 95 Idaho 299, 507 P.2d 808 (1973). Here, as in *Shannon*, there is direct evidence of a knowing, voluntary and intelligent waiver. The trial court, which personally observed Ybarra, concluded that Ybarra "has a fluency in English so as to have been able to understand the rights given." We are not persuaded that this finding was erroneous.

Ybarra also cites *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), for the proposition that he was subjected to an illegal "investigatory detention" when he went to the police station the morning after the robbery. The Court in *Dunaway*, held that the "police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Id.* at 2258. In that case, all the parties conceded that the police did not have probable cause to arrest the petitioner. Nonetheless, the police stated that petitioner would have been physically restrained if he had attempted to leave, and the lower courts found that his presence at the police station was not voluntary. The Court held that incriminating statements made while at the police station had to be suppressed because the mandatory detention was made without probable cause:

"[D]etention for custodial interrogation— regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth amendments when, with-

out probable cause, they seized petitioner and transported him to the police station for interrogation." *Id.* at 2258.

*See also State v. Paz,* 572 P.2d 1036 (Or. App.1977).

In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), however, the Court found that a voluntary appearance at the police station, followed by questioning, did not amount to a deprivation of freedom of action in a significant way. In that case, at the request of the police officer, the defendant called and agreed to come to the police station to talk. The defendant was taken to a room in the police station, the door was closed, and the officer told defendant he wanted to talk to him about a burglary. The officer said he thought defendant had been involved, and that defendant's fingerprints were found at the scene. This latter statement was false. The defendant then confessed, at which time the officer advised the defendant of his *Miranda* rights and took a tape confession. The defendant was then allowed to leave while the case was referred to the district attorney. The Court held as follows:

"In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2 hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" *Id.* at 495, 97 S.Ct. at 714.

Similarly, in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), petitioner accompanied federal drug enforcement agents from the concourse of the airport to the Drug Enforcement Administration office. Although the district court found that the respondent accompanied the agents "voluntarily in a spirit of apparent cooperation,", the court of appeals reversed, holding that the request converted the situation into an arrest, and that probable cause did not exist. The Supreme Court reinstated the district court's findings:

"The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances.... The government's evidence showed that the respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers. There were neither threats nor any show of force. The respondent has been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers.

"On the other hand, it is argued that the incident would reasonably have appeared coercive to the respondent, who was 22 years old and had not been graduated from high school. It is additionally suggested that the respondent, a female and a negro, may have felt unusually threatened by the officers, who were white males. While these factors were not irrelevant, ... neither were they decisive, and the totality of the evidence in this case was plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office." *Id.* at 1879.

■ We find the present case to be controlled by *Mathiason* and *Mendenhall,* rather than *Dunaway.* The evidence in the present case shows that Ybarra was requested to come down to the police station, and that he could have said no. The police did not believe that they had sufficient evidence to arrest him, and his decision to accompany them was voluntary. As stated in *Mendenhall,* "[o]ur conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend

upon her having been so informed." 100 S.Ct. at 1878. The fact that the police failed to inform Ybarra that he did not have to accompany them, or that Ybarra subjectively felt that he had to accompany them, is not controlling. They asked him if he would accompany them, and he agreed. This is not a situation such as *Dunaway*, where in effect the defendant was placed under arrest and taken to the police station without probable cause.[6]

## III.

■ The third issue raised by Ybarra is whether the district court erred in not suppressing Cole's in and out of court identification of Ybarra. Ybarra first argues that it was error not to provide him counsel during the lineup. In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the defendant was taken to the police station under a warrantless arrest. He was identified in a lineup there, and argued that he should have been given an attorney. The Supreme Court upheld the identification, holding that a person has the right to an attorney only "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. at 1882. Formal charges had not yet been brought against Ybarra, and he had no guaranteed right to an attorney at this time.

■ Ybarra also argues that the circumstances of the identification were so suggestive as to amount to a denial of due process. The test is whether "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 380, 34 L.Ed.2d 401 (1972), quoting *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

"[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. at 199–200, 93 S.Ct. at 382.

Ybarra argues that two of the other men in the lineup did not even resemble the description of the robber, and that Cole was allowed to view Ybarra for five minutes before the other lineup participants were brought in. Under the facts of this case we are again not so persuaded. The other participants in the lineup did not differ so dramatically from Ybarra as to make the lineup unnecessarily suggestive and conducive to irreparable mistaken identification. Cole had ample opportunity to view the masked person who robbed her, her description of the robber was reasonably close to Ybarra's, and the lineup occurred the same day as the crime. Although Cole's identification was, as might be expected, not entirely positive, such goes to the weight to be given her evidence by the jury. We agree with the trial court's conclusion that this lineup was not unduly suggestive. In addition there is Cole's testimony that she did not see Ybarra prior to the lineup.

## IV.

Ybarra next argues that the following comments by the prosecuting attorney in voir dire of the prospective jurors constituted reversible error:

"Regarding this reasonable doubt— would you agree with me that the mere fact that a defendant may take the stand and deny his guilt does not in and of itself create a reasonable doubt.

"Would the mere fact that the defendant may take the stand and deny the allegation against him, would that in and of itself constitute a reasonable doubt in your mind?

---

**6.** The state tries to distinguish *Dunaway* by arguing that the police had probable cause to arrest Ybarra when they asked him to come to the police station. We need not pass on this question in view of our holding.

"Concerning the question of the possible denials of the defendant of the allegations against him, does that in and of itself—do you think would constitute a reasonable doubt to you?"

Ybarra also alleges that the prosecutor's statement in closing that "[w]e don't have the defendant saying, yes, I did commit the robbery" was error.

In *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), the United States Supreme Court made it clear that it was concerned only with adverse comment on a defendant's failure to testify:

"It is clear from even a cursory review of the facts and the square holding of the *Griffin* [*v. California*] [380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106] case that the court was there concerned only with *adverse* comment, whether by the prosecutor or the trial judge—'comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' *Id.* at 615, 85 S.Ct., at 1233. The court reasoned that such adverse comment amounted to 'a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the .privilege by making its assertion costly.' *Id.*, at 614, 85 S.Ct., at 1232." *Id.* at 338–39, 90 S.Ct. at 1094.

The court then held that instructing "that the jury must draw *no* adverse inferences of any kind from the defendant's exercise of his privilege not to testify is 'comment' of an entirely different order. Such an instruction cannot provide the pressure on a defendant found impermissible in *Griffin* .... It would be strange indeed to conclude that this cautionary instruction violates the very constitutional provision it is intended to protect." *Id.* at 339, 98 S.Ct. at 1095.

■ The statements made in the present case do not amount to the type of adverse comment envisioned by the Supreme Court. Rather obviously, so it seems, the prosecutor was, and probably improperly, indulging in premature argument that defendant's testimony that he was not involved ought not by the jury be considered sufficient to constitute reasonable doubt. We do not, however, see this apparent impropriety as impinging on constitutional safeguards against self-incrimination.

■ Finally, the prosecutor's statement in closing argument did not refer at all to Ybarra's failure to testify; it referred only to the fact that Ybarra had not pled guilty. Such a statement would better have not been made, but we do not see sufficient grounds to necessitate a reversal.

## V.

Ybarra next argues that the district court erred in an "advance" ruling that the prosecutor could use Ybarra's prior felony conviction as impeachment, *should Ybarra choose to testify.*

I.R.C.P. 43(b)(6) provides in pertinent part:

"A witness may be impeached ... upon a finding by the court in a hearing outside of the presence of the jury that a prior conviction of a felony of a witness is relevant to his credibility, it then may be shown ... that he has been convicted of a felony and the nature of the felony."

Ybarra argued that impeachment by his former robbery conviction would be unfairly prejudicial. The trial court ruled that the state would be allowed to ask Ybarra whether he had ever been convicted of a felony, but that questions concerning the nature of the felony would not be allowed. Ybarra now argues that the crime of robbery is not relevant to credibility, and that the rule does not provide for admission of the fact of a felony conviction without also admitting the nature of the conviction—a both or none proposition.

As to Ybarra's argument that burglary is not relevant to credibility, the law is generally against him. The court in *People v. Rollo*, 20 Cal.3d 109, 141 Cal.Rptr. 177, 569 P.2d 771, 775 (1977), stated that "different felonies have different degrees of probative value on the issue of credibility. Some, such as perjury, are intimately connected with that issue; others, such as robbery and burglary, are somewhat less relevant; and

' "Acts of violence ... generally have little or no direct bearing on honesty and veracity." ' "

The court in *State v. Thomas*, 220 Kan. 104, 551 P.2d 873, 876 (1976), stated the following: "Burglary falls within the category of crimes which involves dishonesty and is admissible for the purpose of impeaching a witness's credibility." The Kansas court relied upon Ladd, *Credibility Test—Current Trends*, 89 Univ.Pa.L.Rev. 166 (1940), wherein it was said:

" ' ...On the other hand robbery, larceny, and burglary, while not showing a propensity to falsify, do disclose a disregard for the rights of others which might reasonably be expected to express itself in giving false testimony whenever it would be to the advantage of the witness. If the witness had no compunction against stealing another's property or taking it away from him by physical threat or force, it is hard to see why he would hesitate to obtain an advantage for himself or friend in a trial by giving false testimony. Furthermore, such criminal acts, although evidenced by a single conviction, may represent such a marked break from sanctioned conduct that it affords a reasonable basis of future prediction upon credibility.... ' (p. 180.)"

*See also State v. Crowley*, 220 Kan. 532, 552 P.2d 971 (1976); *State v. Day*, 91 N.M. 570, 577 P.2d 878 (1978). *But see United States v. Smith*, 551 F.2d 348 (D.C. Cir. 1976). We agree with those courts which hold that a crime such as burglary can be relevant to credibility, and we hold that there was no error in the court's decision to allow use of the prior felony conviction to impeach Ybarra.

As to Ybarra's contention that the court could not allow use of the conviction without also allowing evidence of the nature of the felony, we think that the better rule would be to allow a defendant so impeached and taking the stand to at least have the option of disclosing the nature of the felony the use of which has been to impugn his credibility. Otherwise defendant's counsel is foreclosed from arguing to the jury the very question which he first unsuccessfully argued to the court. Here, the question is in a sense moot, as Ybarra did not take the stand, was not impeached, and hence made no attempt to disclose the nature of the felony which was not shown to the jury in order to impeach him. While it is true that the court preliminarily gave an advance ruling, so to speak, directly confronted with the defendant testifying, a contrary ruling might have resulted. *See State v. Anderson*, Idaho, 631 P.2d 1223, 1981, for the reported views of Judge Robert J. Dunlap of the third judicial district.

VI.

Finally, Ybarra argues that there was insufficient evidence to sustain the jury's verdict. "A conviction may be based on circumstantial evidence, and the conclusion of guilt may be based on proof of the circumstances and the probable deductions which flow therefrom. ... A judgment of conviction will not be disturbed on appeal where there is substantial and competent evidence to support the judgment." *State v. Chapple*, 98 Idaho 475, 476, 567 P.2d 20, 21 (1977). Here, the evidence showed that Ybarra was near the scene of the robbery, dressed in only a short-sleeved shirt on a very cold night, and his exculpatory statements to the police were proven false. Moreover, he was identified at the house where the coat similar to the one used in the robbery was found, and Lucy Cole stated that Ybarra most nearly resembled the person who had robbed her, as compared to the others in the lineup. Although most of this evidence is circumstantial, there is sufficient substantial and competent evidence to support the judgment.

Judgment affirmed.

BAKES, C. J., and McFADDEN, DONALDSON and SHEPARD, JJ., concur.