812 P.2d 1227

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Daniel Edward RODGERS, Defendant–Appellant.**

**No. 17785.**

Court of Appeals of Idaho.

July 25, 1990.

Petition for Review Granted Nov. 13, 1990.

---

**4.** As already noted, there is no contention of any irregularity in the proceedings concerning the sale.

Alan E. Trimming, Ada County Public Defender, Amil ·N. Myshin, Jr., Sr. Trial Atty. (argued), for appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), for respondent.

SWANSTROM, Judge.

Daniel Rodgers appeals a judgment of conviction, and sentence of life imprisonment, for the first degree murder of Preston Murr. The issues we address in this opinion are as follows: (1) whether the district court abused its discretion by admitting evidence of other bad acts committed by Rodgers; (2) whether the district court abused its discretion by admitting impeachment evidence of Rodgers' prior felony conviction; (3) whether the district court erred by admitting expert testimony of blood spatter pattern analysis; (4) whether the district court abused its discretion in denying Rodgers' motion for mistrial; (5) whether the district court erred by denying Rodgers' motion to suppress evidence; (6) whether the district court improperly interpreted a co-defendant's Fifth Amendment privilege; (7) whether the district court erred by denying Rodgers' motion for a new trial; and (8) whether the sentence as imposed was excessive. For reasons which follow, we affirm.

Preston Murr attended a funeral in Boise on June 29, 1987. That afternoon, Murr and a small group of funeral participants became intoxicated and belligerent. A fight broke out between Murr and two others. Police were dispatched to the scene and Murr and the other two combatants were cited for disorderly conduct. Later that evening, Murr called the police from his sister's apartment where he was staying with his girlfriend. Murr told the police that someone had called and threatened to kill him.

Murr made a telephone call to Rodgers, whom he knew, in an attempt to find out who had threatened him. He then left his girlfriend at the apartment and went to a Circle K store on Boise Avenue to meet Rodgers and Daron Cox. When Rodgers and Cox arrived at the store, Murr was observed using the pay telephone while holding a baseball bat. Murr joined Rodgers and Cox in Rodgers' car and drove to Murr's sister's apartment where the three discussed the threatening telephone call and the whereabouts of guns that had been stolen from Rodgers. The three left the apartment and drove to Rodgers' house at 805 Linden Street where Rodgers obtained his gun. According to statements later made by Rodgers and Cox, Murr wanted to show Rodgers an apartment where he believed Rodgers' stolen guns were located. The trio then drove throughout Boise trying to locate the apartment and the persons who allegedly had stolen Rodgers' guns. Eventually Murr telephoned his girlfriend to inform her of his plans.

The trio then returned to 805 Linden Street. Around midnight, an altercation broke out and Murr was shot in the shoulder with a .357 magnum handgun. Murr ran out of the house and into the neighborhood in an attempt to escape. While trying to flee his attacker, Murr attempted to enter the home of a neighbor. The neighbor heard pounding at his door and someone screaming, "Let go of me." Then he heard an anguished yell. Peeking out the window, the neighbor saw someone chasing Murr. Murr was finally apprehended by his assailant and taken back into the house at 805 Linden Street. Thereafter, Murr was fatally shot in the back of the head with a .357 magnum bullet to the brain.

About this time, the neighbor telephoned the Boise Police Department Dispatcher to report the commotion outside and reported that there appeared to be blood on his door. The neighbor then looked out his window again and noticed two people at 805 Linden Street moving around the porch and yard. He then saw one of them hosing down the porch with a garden hose. Then one of the persons approached his house with a flashlight and appeared to be looking for some-

thing. The neighbor watched through the curtains, expecting the police to arrive. However, the police never responded to the call, and he went to bed.

Murr's body had been cut into pieces with an axe and knives in the basement of Rodgers' home and placed into plastic bags. The bags were put into the trunk of a brown Grand Prix automobile belonging to Rodgers' wife. During the early morning hours of June 30, Rodgers and Cox drove the automobile to an area near Weiser, Idaho on the Idaho–Oregon border. Most of the body parts were thrown into the Brownlee Reservoir. Part of the body that did not sink was taken to a bluff approximately 100 yards above the water. The plastic bags, bloody gloves and other clothing were discarded in a dumpster behind a convenience store in Meridian, Idaho.

The next morning, the neighbor observed a "brown sedan" stopped in the street next to his house, then it was driven away. He called the police and told them to come out and investigate the blood he found on his front screen door. The police arrived at the scene and upon seeing the trail of blood, called for backup. Blood was spattered on the neighbor's house as well as other houses in the neighborhood. The area was then blocked off as investigators arrived to determine whether someone was injured inside the house. After knocking and calling without answer, the police sealed off the area and waited for search warrants to be issued before entering the residence at 805 Linden Street. There, the officers found blood in the house, particularly in the basement. Drugs and money were also found and seized. They discovered a bullet fragment inside a clothes dryer and a bullet hole in a door at the top of the basement stairs. Eventually they located a handgun belonging to Rodgers in the bottom of a speaker stand or cabinet.

Rodgers and his wife were arrested on June 30 and charged with possession of controlled substances with intent to deliver

and other drug-related crimes. A few days later people discovered parts of Murr's body along the banks of the reservoir. Police charged Rodgers and Cox with murder. Cox talked to police, giving them details of the grisly murder, leading the police to evidence, placing blame on Rodgers for the murder, and attributing his own involvement to his fear of Rodgers.

Separate trials were ordered for Rodgers and Cox. Rodgers' trial was scheduled first. He testified during his trial but Cox was considered unavailable and was not called to testify. Although Rodgers had made some exculpatory statements to police early in the investigation about where he had been on the night of the murder, he did not admit, until trial, that he was present at the 805 Linden Street residence when Murr was killed.

At trial, Rodgers related that he tried to break up a knife fight which occurred in the basement between Murr and Cox. He testified that Murr suddenly came at him with a knife and he fired a warning shot in self-defense. The shot unintentionally struck Murr in the shoulder as Murr rushed into Rodgers, knocking him down and causing him to lose his gun. As Murr then fled up the stairs, Cox seized the gun and fired at him. Cox chased him down and brought him back to the basement. Rodgers was then upstairs when he heard the fatal shot. Cox then came up, said that he had killed Murr, and announced his plan to dispose of the body. Rodgers testified that he could not participate in the butchery but admitted that he helped clean up and dispose of the evidence.

## ADMISSIBILITY OF OTHER CRIMES

■ Rodgers alleges the district court abused its discretion by admitting evidence in the murder trial of his drug-dealing activities. Approximately thirteen pounds of marijuana and a large amount of cash were found by police officers investigating the scene at 805 Linden Street.[1] Evidence of

---

1. The drug charges against Rodgers were not presented in the murder trial. In a separate proceeding, Rodgers pled guilty to possession of

a controlled substance with intent to deliver, a felony. I.C. § 37–2732. Rodgers also pled guilty to possession of drug paraphernalia, a

this discovery eventually was admitted. Rodgers does not suggest the evidence of the drugs and money found at the 805 Linden Street scene was irrelevant. However, he argues that introduction of such evidence was unduly prejudicial and was meant to inflame the jury.

Evidence of other bad acts may be admitted if relevant to a material issue concerning the offense charged. A two-tiered analysis is required to determine whether the evidence of other bad acts should be admitted. *State v. Matthews*, 108 Idaho 482, 700 P.2d 104 (Ct.App.1985). The first tier explores whether the evidence is relevant to a material and disputed issue concerning the crime charged. *Id.; State v. Greensweig*, 102 Idaho 794, 641 P.2d 340 (Ct.App.1982). The second tier requires the determination of whether the probative value of the evidence is outweighed by the unfair prejudice to the defendant. *State v. Matthews, supra; State v. Stoddard*, 105 Idaho 533, 670 P.2d 1318 (Ct.App.1983) (review denied). This balancing decision is within the discretion of the trial court and will not be overturned on appeal unless such discretion has been abused. *State v. Carlson*, 108 Idaho 859, 702 P.2d 897 (Ct. App.1985).

Facts separately connected to the chain of events of which the act charged is a part are admissible even though the commission of other crimes may be shown. *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107 (1975). "The jury is entitled to base its decision upon a full and accurate description of the events concerning the whole criminal act, regardless of whether such description also implicates a defendant in other criminal acts." *Id.* at 670, 534 P.2d at 1110. *See also State v. Roach*, 109 Idaho 973, 712 P.2d 674 (Ct.App.1985). Furthermore, evidence of other crimes or bad actions by the defendant is admissible if there is a logical tendency to make more probable the truth of the allegations being asserted. Therefore, evidence of other bad acts is admissible if it tends to establish: (1) motive, (2) intent, (3) absence of mistake or accident,

(4) design, plan or scheme or (5) identification of the accused as a person who committed the crime charged. *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983); *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Shepherd*, 94 Idaho 227, 486 P.2d 82 (1971).

At the beginning of the trial, the district court issued a ruling disallowing the state to present evidence in its case-in-chief of the other charges against Rodgers. However, during the state's opening statement, the prosecutor told the jury: "the defendant, Dan Rodgers, was in custody on other charges after 3 p.m. on the thirtieth day of June." At that time, defense counsel made a timely objection and moved for a mistrial. The district court sustained the objection and took the motion for mistrial under advisement. Next, the state's witness, Manuel Martinez, a Boise policeman first at the scene of 805 Linden Street, stated on cross-examination: "I'm pretty sure that was the search party. They had broke it up [sic] into vice/narcotics and detectives...." Again defense counsel objected to the reference to narcotics and moved for a mistrial. The district court denied this motion for a mistrial. Another state witness stated that he was currently assigned to the narcotics investigation team. Defense counsel objected and moved for another mistrial which was again denied by the district court.

Late into the trial, the state offered testimony of Barbara Fleming as to several conversations she had with Rodgers prior to the murder. Rodgers purportedly told her about thefts of his personal property, including guns, marijuana and cocaine from his home and apartment. Fleming related that Rodgers told her he would find out who was responsible, and he would take care of it. After carefully outlining the permissible limits of this witness' proposed testimony, the court allowed the jury to hear it as evidence of motive and intent. Rodgers again moved for a mistrial; again, the motion was denied.

misdemeanor. I.C. § 37–2734B. The sentences imposed for the drug counts were to run concurrently with Rodgers' life imprisonment sentence for murder in the first degree.

Later, on March 15, 1988, the state again attempted to introduce evidence of other bad acts by Rodgers, specifically as to evidence of drugs and money seized from 805 Linden Street. After discussion between the parties with the jury absent from the courtroom, the district court ruled that evidence of the drugs and money was relevant to show Rodgers' motive to kill, but that its prejudicial impact still outweighed its probative value at that point in the trial. Near the end of the trial, the defense called Rodgers to the stand. He testified to various events involving himself, Cox and Murr around the time of the killing, giving reasons for his own actions that day. Rodgers testified that Murr was trying to help him find persons who had stolen some of his guns and that he did not suspect Murr of the thefts.

A state's witness, however, had testified that Rodgers talked about wanting to find the person who had stolen drugs and money from him. The conflicting testimony framed an issue of credibility. After the direct examination of Rodgers was completed, the district court ruled that the probative value of the drugs and money now outweighed its prejudicial impact. The court allowed the state on cross-examination to introduce evidence of the marijuana and money seized at 805 Linden Street. Although the court referred to the evidence as probative of the motive for the murder, it is clear from the context of the events at trial that the evidence was recognized for its impeachment value as well. Defense counsel again moved for mistrial and the motion was denied by the district court. In its final instructions to the jury, the court gave a cautionary instruction to remind the jury that this evidence was admitted for specific limited purposes only.

As noted above, the decision of whether to allow evidence of prior bad acts lies in the trial court's discretion. Early in a trial, a judge may be cautious in assessing the relevancy and need of "other crimes" evidence. As the trial unfolds, certain evidence may become relevant for more than one purpose—here, for motive and impeachment. Such enhanced relevancy may tip the scales toward admissibility of the evidence and cause the probative value of the evidence to outweigh any unfair prejudice. That, we think, is what happened in this case.

The prosecutor's opening statement referring to Rodgers' other bad acts, namely, the marijuana and money seized from 805 Linden Street, is not condoned by this Court. When a trial judge makes a ruling disallowing certain evidence, the prosecutor must follow such court order. However, an error may be deemed harmless if it does not affect the substantial right of the accused. I.C.R. 52. To determine whether a substantial right has been affected depends upon whether that error, as appears from the record, contributed to the guilty verdict. On appeal, an error is harmless if the reviewing court finds, beyond a reasonable doubt, that the jury would have reached the same result absent the error. *State v. Boehner*, 114 Idaho 311, 756 P.2d 1075 (Ct.App.1988). Here, of course, the evidence eventually was properly admitted by the trial court. Therefore, earlier statements made by the prosecutor and other state's witnesses regarding drugs or money seized turned out to be harmless error.

## EVIDENCE OF PRIOR FELONY CONVICTION

■ Rodgers contends the trial court erred in allowing the state to introduce—for impeachment purposes—the fact that he had been convicted of a prior felony. Before Rodgers testified, the district court ruled the state would be allowed to ask Rodgers if he had a felony conviction, but not the nature of that felony. Rodgers had been convicted of second degree murder in California in 1977.[2]  *See* CAL. PENAL

---

**2.** I.R.E. 609(b) places a time limit within which a prior felony conviction may be used for impeachment purposes at trial. Evidence is inadmissible if more than ten years has elapsed since the date of the conviction or date of release from confinement imposed for that con-

viction, whichever date is later. Here, Rodgers pled guilty to second degree murder in California in 1977. He was released from the California penal system in 1982. Therefore, Rodgers' prior felony conviction fell within the time limit as set forth in I.R.E. 609.

CODE § 187 (Deering 1975). Balancing the probative value against the prejudicial effect of such impeachment evidence is left to the discretion of the trial judge and will not be disturbed on appeal unless that discretion has been abused. *State v. Winkler*, 112 Idaho 917, 736 P.2d 1371 (Ct.App. 1987). Here, the judge properly followed I.R.E. 609 in ruling that this evidence could come in for purposes of impeachment. As a result of the judge's ruling, Rodgers' counsel took the preemptive tactic of asking Rodgers if he had been previously convicted of a felony so as to deny the state the opportunity to surprise the jury with this information.

Rodgers now attacks the judge's ruling on two grounds. First, he contends the prior conviction was not relevant to his credibility. Second, he urges that even if the evidence was relevant, its probative value was outweighed by the impact of unfair prejudice. *See* I.R.E. 403. There has been much discussion in the cases regarding the relationships between felony convictions and witness credibility. *State v. Pierce*, 107 Idaho 96, 685 P.2d 837 (Ct. App.1984) (review denied). We acknowledge that different felonies have differing degrees of probative value regarding the issue of credibility. *State v. Ybarra*, 102 Idaho 573, 634 P.2d 435 (1981), identifies three categories of felonies. The first category recognizes crimes such as perjury that have direct bearing on credibility because they deal with honesty or veracity. The second category includes crimes such as burglary or robbery which have less evidence bearing on credibility due to their indirect dealing with veracity and have only a general relationship to honesty. The third category are those crimes described as acts of violence. In *Ybarra*, our Supreme Court, quoting *People v. Rollo*, 20 Cal.3d 109, 141 Cal.Rptr. 177, 569 P.2d 771, 775 (1977), noted that "Acts of violence . . . generally have little or no direct bearing on honesty and veracity." 102 Idaho at 581, 634 P.2d at 443. *See also State v. Allen*, 113 Idaho 676, 747 P.2d 85 (Ct.App.1987).

Not all acts of violence are products of uncontrolled passion or emotional impulse, however. In California, murder in the second degree is an unlawful killing of a human being with "malice aforethought." "An intent to kill" or circumstances showing "an abandoned and malignant heart" are manifested by the perpetrator of such a crime. *Jackson v. Superior Court of City and County of San Francisco*, 62 Cal.2d 521, 42 Cal.Rptr. 838, 399 P.2d 374 (1965). While such a crime has no "direct bearing" on credibility, it nevertheless has a significant bearing much the same as the crimes of burglary and robbery. In *Ybarra*, the Supreme Court quoted the following language from Ladd, *Credibility Test—Current Trends*, 89 Univ.Pa.L.Rev. 166, 180 (1940):

> On the other hand robbery, larceny, and burglary, while not showing a propensity to falsify, do disclose a disregard for the rights of others which might reasonably be expected to express itself in giving false testimony whenever it would be to the advantage of the witness. If the witness had no compunction against stealing another's property or taking it away from him by physical threat or force, it is hard to see why he would hesitate to obtain an advantage for himself or friend in a trial by giving false testimony. Furthermore, such criminal acts, although evidenced by a single conviction, may represent such a marked break from sanctioned conduct that it affords a reasonable basis of future prediction upon credibility. . . .

It can also be said that if a witness had no compunction against deliberately taking another's life away by physical force, it is hard to see why he would hesitate to obtain an advantage for himself in a trial by giving false testimony. Following this reasoning, we hold that the trial court was correct in concluding that the impeachment value of the crime of murder in the second degree is "substantial." *Accord, State v. Anderson*, 31 Wash.App. 352, 641 P.2d 728 (1982); *State v. Dickson*, 143 Ariz. 200, 693 P.2d 337 (1985).

■ After holding that the conviction was relevant to credibility should the defendant testify, the trial court then undertook the weighing of the probative value of

this evidence against its prejudicial effect, as required by I.R.E. 609. In this process the judge considered the impeachment value of the prior crime, the remoteness of the prior conviction, the witness's criminal history, the similarity between the past crime and the crime charged, the importance of the witness's testimony, the centrality of the credibility issue, and the nature and extent of the witness' criminal record as a whole. These factors are very similar to those suggested by the Washington State Supreme Court in *State v. Alexis,* 95 Wash.2d 15, 621 P.2d 1269 (1980). This process led the district court to conclude that the conviction was relevant to Rodgers' credibility and that its probative value outweighed the prejudicial effect. The court therefore allowed evidence concerning the fact the defendant had been convicted of a felony but, to minimize prejudice, the court did not allow the state to show the *nature* of the felony. We hold that no abuse of discretion occurred. The court did not err in admitting evidence of the prior conviction of a felony.

## ADMISSIBILITY OF EXPERT TESTIMONY

Rodgers argues the district court erred by permitting expert testimony regarding blood spatter interpretation evidence to be admitted at trial. An "expert" is a witness with "the power to draw inferences from the facts which a jury would not be competent to draw." McCORMICK ON EVIDENCE § 13 at 33 (3d ed. 1984). The Idaho Rules of Evidence provide for expert testimony "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." I.R.E. 702. Whether a witness is sufficiently qualified as an expert is a matter largely within the discretion of the trial court. *State v. Hopkins,* 113 Idaho 679, 747 P.2d 88 (Ct.App.1987). Rodgers argues the witnesses testifying as to the blood spatter patterns did not meet the

standards of I.R.E. 702 and should not have qualified as experts.

■ The first expert witness, Dr. Irving Stoner, was a forensic scientist and chief of the physical evidence section at the Institute of Forensic Sciences in Dallas, Texas. Stoner supervised seventeen forensic scientists at the institute and was a special agent for the Federal Bureau of Investigation (FBI) spending two years in the FBI laboratory. Stoner has also published a number of scientific articles regarding blood stain analysis. Stoner had specific training in blood spatter pattern analysis, studied blood stain pattern literature, worked with other experts in the field, and has testified on blood spatter pattern interpretation in the courts of Texas, Missouri, Arkansas, Illinois, Georgia and Puerto Rico.

The second expert was Ada County Deputy Coroner Daniel Christman. Christman had previously worked for the King County Medical Examiner's Office in Seattle, Washington, as a medical investigator and also as a pathology technician. Christman had an associate's degree in criminal justice from Bellevue Community College and had taken courses in geometric blood stain interpretation. He had also received specific instruction in the field of blood spatter interpretation by Sergeant Tom Bevel of the Oklahoma City Police Department. Sgt. Bevel was identified as an expert in the field by Stoner. Christman has applied the principles of blood spatter pattern analysis in a number of cases and explained his methodology to the court and the jury. The district judge found the above qualifications sufficient to render Stoner and Christman experts in the area of blood spatter pattern analysis. Based on the qualifications listed above, we hold the district court did not err by qualifying Stoner and Christman as experts in blood spatter pattern analysis.

■ Rodgers' next contention is that the practice of analyzing blood spatter patterns is not generally accepted in the scientific community. Rodgers cites *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), for the proposition that a foundation of general

acceptance in the scientific community must be laid before expert testimony of a particular scientific technique may be admitted. However, "Rule 702 favors the admissibility of the testimony by experts if relevant and if it will assist the trier of fact to understand the evidence or resolve a controverted issue of fact, regardless of whether it is an ultimate issue of fact." G. BELL, HANDBOOK OF EVIDENCE OF THE IDAHO LAWYER at 242 (3d ed. 1987). The purpose of the *Frye* test is to ensure that the probative value of the expert testimony not be significantly outweighed by the risk of jury confusion, time wasting or undue prejudice. *Id.* at 243. However, I.R.E. 403 ensures such balancing of the probative value versus its prejudicial effects and eliminates the problem the *Frye* test created, namely, disallowing expert testimony utilizing new scientific and technological breakthroughs. Therefore, we hold the district court properly qualified Stoner and Christman as experts pursuant to Rule 702. Further, we hold the practice of analyzing blood spatter patterns is admissible in the Idaho courts when it is helpful to the trier of fact to determine the events that took place at the scene of the crime.

## MISTRIAL MOTION

■ Rodgers asserts the district court abused its discretion in denying his mistrial motion based on the prosecutor's improper introduction of Rodgers' post-arrest silence. On cross-examination, the prosecutor asked Rodgers: "Have you ever told any police officers the story you have told the jury this morning?" It is fundamental error to introduce evidence of a defendant's silence to either raise an inference of guilt or to impeach the defendant's testimony. *State v. Gooding,* 110 Idaho 856, 719 P.2d 405 (Ct.App.1986) (review denied); *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

Rodgers was taken into custody on June 30, 1987, on the drug charges. After being given the proper *Miranda* warnings, he waived his right to remain silent and related his version of some of the events sur-

rounding the murder of Preston Murr. The statements made to police at that time were inconsistent with Rodgers' testimony at trial. It is not improper to cross-examine a defendant regarding inconsistencies of a prior statement given after a knowing, voluntary waiver of the right to remain silent. *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Nevertheless, the district court sustained Rodgers' objection and gave a curative instruction. Rodgers argues that this was not sufficient to neutralize the prejudicial impact which effectively denied him a fair trial. We disagree.

We believe the prosecutor's question fairly inquired about the inconsistency between voluntary statements Rodgers made to police in the investigation and his sworn testimony at trial. Under *Anderson,* the question was permissible. Nevertheless, the district court sustained Rodgers' objection. No error harmful to Rodgers was committed. Therefore, we hold the district court did not abuse its discretion by denying Rodgers' motion for a mistrial.

## MOTION TO SUPPRESS

■ Rodgers argues the district court erred by denying his motion to suppress evidence seized at 805 Linden Street. Rodgers alleges the evidence was taken without a valid search warrant and without a legitimate exception to the warrant requirement. Specifically, Rodgers claims that his home at 805 Linden Street was entered by police approximately five hours before the issuance of a search warrant.

Rodgers contends that Shelly Stierle telephoned 805 Linden Street at approximately 10:30 a.m. on June 30, 1987, asking to speak to Dan or Kathryn Rodgers about a possible baby-sitting job that evening. During a suppression hearing, Stierle testified that a man named "Lance" answered the telephone and told her that he, "Mike" and "Tony" were there. Lance did not identify himself as a police officer to Stierle. Stierle testified that she had not slept all night and was not positive as to the exact time that she called the Rodgers' residence.

In his testimony, Detective Lance Anderson stated that a person named Shelly Stierle did call around 4:30 p.m. on June 30, 1987, after the search warrant had been issued. In addition to Anderson's testimony, several other officers testified that 805 Linden Street was not entered before the search warrant was issued.

Rodgers argues the district court abused its discretion by believing the testimony of the police officers in preference to the testimony of Stierle as to whether the officers had entered the premises before the warrant was issued. Determining credibility of witnesses and the weight to be given to conflicting testimony are matters within the province of the trial court. We will not substitute our opinion of witnesses' credibility for that of the trier of fact. Where, as here, the findings of the district court are supported by substantial and competent, though conflicting, evidence, those findings are not clearly erroneous and will not be disturbed on appeal. I.R.C.P. 52(a); *State v. Sensenig,* 113 Idaho 403, 744 P.2d 131 (Ct.App.1987).

Rodgers goes on to argue that the evidence showed the police "seized" the 805 Linden Street residence to await the procurement of the search warrant and that such action violated the Fourth Amendment to the United States Constitution. Where there is probable cause for a search of the premises, it is well settled the police may secure the premises while a warrant is being obtained. *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The Idaho Supreme Court has held that securing the premises while waiting for a search warrant does not violate any requirement of state statute or rule. *State v. Gomez,* 101 Idaho 802, 623 P.2d 110 (1980). Accordingly, we hold that Rodgers' Fourth Amendment rights were not violated by the police seizure of the residence at 805 Linden Street while waiting for issuance of a valid search warrant.

## FIFTH AMENDMENT

Rodgers contends the district court erroneously determined that Cox could not be required to testify because he had exercised his Fifth Amendment privilege. We disagree with Rodgers' interpretation of the district court's ruling. On the next-to-last day of trial, counsel met with the judge in chambers to determine a timetable for the remaining witnesses and for holding a conference on proposed jury instructions. The record of this conference shows that in response to a concern voiced by defense counsel, the prosecutor said he did not intend to call Cox as an additional rebuttal witness. Rodgers' counsel later indicated that he might decide to call Cox and if he did "it will stretch out another day." This colloquy followed:

MR. BOWER: Under what circumstances were you going to call Cox?

MR. ADAMS: If I want to examine him in front of the jury.

MR. BOWER: He would have the right to take the Fifth Amendment.

MR. ADAMS: He would if you called him, too, Greg.

MR. BOWER: That's what I mean. I don't think ethically you can call him in front of the jury and ask him to testify. That would be a violation.

MR. ADAMS: Well, you know how to file one. I'm telling you if I decide to call him, it's going to stretch it out a while. We should have that determination by the morning, or perhaps we could have it by 5 today.

The next morning, counsel and the court conferred again to discuss the instructions. Thereafter, Rodgers' counsel asked for a ruling regarding an inmate witness he was going to call to testify regarding statements purportedly made by Cox while in jail. The state argued that the testimony would be inadmissible hearsay. Rodgers' counsel argued the purported statements by Cox were admissible, under an exception to the hearsay rule, to show that Cox was willing to give the police false information about Rodgers; that Cox had his own motive to kill Murr. Rodgers' counsel noted that Cox was unavailable to testify.

THE COURT: What's the basis of Mr. Cox's unavailability as a witness?

MR. ADAMS: Well, I can certainly call him, but as was pointed out on the record

**1076**

yesterday, he's going to take the Fifth Amendment. I think that if the court wants to take judicial notice of his unavailability, and that he's a codefendant and he's represented by counsel, that would be fine. If not, I can certainly have a motion and order to transport him and put him on the stand.

MR. BOWER: I would cite the court to [I.R.E.] 804(3) under (b) on page 350. "A statement tending to expose the declarant to criminal liability and offering to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." That's just the backwards side of what we have here.

MR. ADAMS: Oh, I don't think so, Judge. There has certainly been much corroboration that Mr. Cox has cooperated with the police. That's been corroborated by the State's witnesses in their case in chief.

As long as we're deciding that, Judge, we've got another witness and it's probably going to have to be viewed in the same kind of an aspect as we're viewing this. His name is J.D. Glandon. He's going to testify that Cox told him, "Listen, I want to get Dan out of the way, and I'm going to get him out of the way because I want Dan's wife and I want his business."

We're going to propose to put Glandon on the stand to say Cox made those statements to him.

THE COURT: And who is he? Is he a person who is—

MR. ADAMS: He's currently housed at the Community Work Center.

MR. BOWER: Again, it's a statement, Your Honor, that is the rankest of hearsay and an attempt to impeach a witness who hasn't testified.

MR. ADAMS: Well, Mr. Bower, why don't you call him [Cox] to the stand and let him testify? If that's the problem, we can certainly have him transported and put him on the stand and see whether he's available to testify or not.

Later, before Rodgers' counsel called an inmate informant, defense counsel requested the court to take judicial notice that Cox was a co-defendant in the trial. However, the state offered to stipulate as to Cox's unavailability and the court agreed to such stipulation. This stipulation operated to allow Rodgers to call two witnesses testifying about statements made by Cox while in the county jail. Contrary to Rodgers' interpretation, the district court made no such ruling that Cox had in fact exercised his privilege against self-incrimination. The district court merely accepted the stipulation that Cox was unavailable as a witness pursuant to I.R.E. 804(b)(3).

After the defense rested and before closing statements were made, the jury requested the court to provide an explanation why Cox did not testify. The district judge discussed the question with counsel and made the following statement: "I think I would just state to the jury that was just a foundation to having the next two witnesses testify and that they need not concern themselves about it." At the state's suggestion, and with Rodgers' agreement, the court explained to the jury the Fifth Amendment rights that every person holds.

In the face of this record, Rodgers asserts the court erred in not requiring Cox to testify. He contends that Cox had waived his Fifth Amendment privilege against self-incrimination by voluntarily producing evidence, by directing the police to sites where evidence could be found, and by making statements to police.

Rodgers admits that Cox's anticipated testimony "would have attempted to inculpate [Rodgers]." He argues the expected testimony "would not be incriminating as to [Cox]." However, he argues that had Cox been required to testify, Rodgers could have more effectively shown that it was Cox who had in fact committed the murder. Finally, he contends that defense counsel's failure to object to "cloak[ing] Cox with a blanket right not to testify" is not fatal because it was fundamental error to allow the prosecutor to invoke the Fifth Amendment privilege on Cox's behalf. We disagree.

We believe it is sufficient to say that under the circumstances shown above, the

trial court committed no error in accepting the stipulation of counsel that Cox was an unavailable witness. Rodgers did not indicate that he needed the court's permission to call Cox if, indeed, he wanted to. Moreover, it is clear that defendant's counsel were not in any way deterred from calling Cox by the prosecutor's statements. No request was made to the trial court to grant immunity to Cox. Moreover, the record does not show that Rodgers requested the prosecutor to grant Cox use immunity.

The prosecutor is accorded the power to grant use immunity pursuant to I.C. §§ 19–1114, –1115. "It cannot be said to be an abuse of the immunity power not to grant it when it has not been requested." *State v. Ramsey*, 99 Idaho 1, 4, 576 P.2d 572, 575 (1978). We believe the case of *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980), upon which Rodgers relies, is inapposite here. We are not persuaded that error has been shown, let alone fundamental error. Accordingly, we do not need to address Rodgers' argument that Cox had somehow waived his Fifth Amendment right not to testify by talking to and cooperating with the police.

## NEW TRIAL MOTION

Rodgers contends the district court abused its discretion by denying his motion for a new trial. A new trial may be granted "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial." I.C. § 19–2406(7). Such motion may be granted if the following criteria are met: "(1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant." *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976), *quoting* 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 551 at

515 (1969); *see also State v. Ames*, 112 Idaho 144, 730 P.2d 1064 (Ct.App.1986).

Rodgers argues that once Cox pled guilty to lesser included charges following Rodgers' trial, Cox effectively waived his Fifth Amendment right to remain silent. Therefore, Rodgers concludes that Cox would be available to testify at Rodgers' new trial and such testimony would constitute newly discovered evidence.

Rodgers has failed to show how Cox's testimony would materially aid his defense at a new trial. If anything, Cox' testimony would be highly damaging to Rodgers if the testimony paralleled the statements Cox made to police. Certainly, we cannot say that the "new" evidence portends any likelihood of acquittal. Furthermore, Rodgers has not provided, nor has our research discovered, any authority for this proposition that a defendant is entitled to a new trial in order to place a co-defendant, who has not previously testified, before a new jury in defendant's retrial. *Compare Government of Virgin Islands v. Smith, supra.*

In addition to the above reasons, I.C. § 19–2406(7) requires Rodgers to produce "affidavits of the witnesses by whom such evidence is expected to be given, . . . ." The record on appeal does not contain an affidavit sworn by Cox indicating what his testimony would include at a new trial. Without such information, the district court correctly denied Rodgers' motion for a new trial. *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1986), *cert. denied* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986).

## EXCESSIVE SENTENCE

Rodgers contends the district court abused its discretion because the sentence imposed was unduly harsh and excessive. The only authorized punishment for murder in the first degree is death or life imprisonment. A life sentence may state not less than ten years as the minimum period of incarceration. I.C. § 18–4004. The district court imposed upon Rodgers a fixed life sentence for the murder of Preston Murr. In a separate proceeding, Rodgers pled guilty to Counts Three and Five.

Count Three charged him with felony possession of a controlled substance with intent to deliver. I.C. § 37–2732. The maximum sentence available for that crime is a fixed term of five (5) years and a fine of $15,000. Count Five set forth the crime of misdemeanor possession of drug paraphernalia. I.C. § 37–2734B. The maximum sentence available for I.C. § 37–2734B is one year imprisonment in the county jail and a fine of $1,000. The district court sentenced Rodgers to a fixed term of five years for Count Three and a term of one year on Count Five. All sentences were to run concurrently, with credit for time served to be applied to the sentences imposed for Counts Three and Five. Sentences imposed within the statutory maximums are not disturbed on appeal absent a showing that the sentencing court clearly abused its discretion. *State v. Cotton*, 100 Idaho 573, 602 P.2d 71 (1979).

Rodgers challenges the sentences on the grounds that they are unreasonably excessive when looking at the circumstances surrounding his case. To challenge the reasonableness of a sentence, the appellant must demonstrate that the sentence was excessive in light of the necessity to accomplish the primary objective of protecting society and achieving all the related goals of deterrence, rehabilitation and punishment or retribution for wrong doing. *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982).

Due to the fixed nature of Rodgers' sentence for first degree murder, the probable confinement is for the remainder of his life. After imposing the life sentence, the district court filed written findings of fact and conclusions of law. The district court noted therein:

> The defendant is a dangerous person. He should never be allowed to go free. Nevertheless, he can be controlled in a prison setting. Actual execution of a death sentence, if imposed, is uncertain and unlikely. Under our present system of laws, the interest of the State of Idaho in the administration of a just sentence, in the certainty of protecting society, and in the certainty of punishment, best will [be] served by imposition of a fixed life sentence with the expectation that the defendant will remain in prison until his death.

As discussed earlier, Rodgers had a prior conviction in California for second degree murder in 1977. Information provided to the judge for sentencing in the present case shows the prior murder bore some factual similarities to this case. There, after giving the victim a ride, Rodgers ordered him out of the car. He then shot the victim in the chest. As the victim lay face down by the side of the road, he was shot three more times in the back of the head. Rodgers at first denied any involvement then later maintained his first shot was fired in self-defense. He pled guilty to murder in the second degree.

Based on the gruesome facts of this case and the district court's careful consideration of sentencing options, we hold the court did not abuse its discretion in imposing the life sentence upon Rodgers.

### CONCLUSION

We hold that Rodgers' conviction for murder in the first degree was proper and the fixed life sentence was reasonable in light of the circumstances of the case. Accordingly, we affirm the judgment of conviction, including the sentence.

HURLBUTT, J., Pro Tem., concurs.

BURNETT, J., participated in oral argument but resigned July 16, 1990, prior to issuance of the Court's decision in this case.