817 P.2d 1083

STATE of Idaho, Plaintiff–Respondent,

v.

Richard Lee WOLVERTON,
Defendant–Appellant.

No. 18727.

Court of Appeals of Idaho.

Aug. 2, 1991.

Petition for Review Denied Oct. 22, 1991.

Alan E. Trimming, Ada County Public Defender, August H. Cahill, Jr., Deputy Public Defender, Boise, for appellant. August H. Cahill, Jr., argued.

Larry J. EchoHawk, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen., Boise, for respondent. Michael A. Henderson argued.

WALTERS, Chief Judge.

Richard Lee Wolverton was found guilty by a jury of rape, robbery (two counts), kidnapping, and the use of a firearm in the commission of those crimes. *See* I.C. § 18–6101 (rape), I.C. § 18–6501 (robbery), I.C. §§ 18–4501 & 02 (kidnapping), *and* I.C. § 19–2520 (possession of a firearm during a crime). He was sentenced to the custody of the Board of Correction for a life term, enhanced by fifteen years for the use of a firearm, and with a minimum period of incarceration of twenty-five years, on each offense. The sentencing court ordered that the terms be served concurrently. On appeal, Wolverton asserts that the court below committed three errors. First, he argues that the court erred when it denied his motion for mistrial made on the ground that the prosecutor had impermissibly commented in front of the jury upon Wolverton's exercise of his right to remain silent. Second, he claims that the court erred when it allowed the statements of the victim's psychologist to be included in Wolverton's presentence investigation report. Third, he asserts that the court abused its discretion by imposing excessively long sentences. We find no error and affirm the judgment of conviction and sentences.

## Facts

Evidence introduced at trial revealed that on September 1, 1989, Wolverton came to the Boise home of his victim, D.R., shortly before 9:00 a.m. and just after she had sent her daughters to school. He asked to use the telephone. Thinking that he was a utility worker, D.R. let him in. Once inside, Wolverton pulled out a handgun and ordered D.R. to lie on the floor. He bound her hands and feet with duct tape and told her, "My friend has your daughter. And if you don't cause a fuss or a scene, we won't hurt her." After unsuccessfully searching for money, Wolverton gathered some guns from the house. He then took D.R. outside to her car, put her in the passenger's seat and drove off with her. After a while he stopped the car. D.R. pleaded for help. Wolverton said, "No, you know what I look

like. And I have to get rid of you." After more driving and a brief stop to talk to his friend who had been following in another vehicle, Wolverton turned onto a dirt road in the desert near the Black's Creek exit from I–84. He ordered D.R. out of the car, cut her clothes off with a knife, and engaged in sexual intercourse with her on the hood of her car. When finished, he took the rings from her fingers and re-taped her ankles. Wolverston then left with his friend in the second vehicle. D.R. managed to free herself from the duct tape, and after finding some clothes in the back of her car she started walking, eventually reaching I–84. There she was picked up by a passing motorist who took her to her husband's office in Boise. A quick call to their school revealed that neither of her daughters had been kidnapped.

D.R. was taken to St. Luke's Hospital, where Rita Rowe, an examining detective, described her as being "extremely upset, visibly shaking, very apprehensive. She wept continually." Ms. Rowe noticed traces of adhesive on D.R.'s hands, wrists and ankles. The examining nurse found bruises and scratches on her arms and red marks on her wrists and ankles. The attending doctor also observed scratches and some redness of the skin around the wrists and ankles, together with a small amount of a sticky gray substance that appeared to be glue or adhesive.

When the police located D.R.'s car in the desert, they found Wolverton's fingerprints on the door frame and his palmprints on its hood. Two pieces of duct tape were found on the ground by the front of the car. Wolverton's fingerprints were on the tape. On September 19, 1989, Wolverton was arrested at a cabin in Boise County.

When Wolverton was arrested he was advised of his rights. When asked, he denied any involvement in the crimes. After being transported to the law enforcement building in Ada County, he was again advised of his rights. Wolverton stated that he would "just [as] soon have an attorney." The police continued to ask him questions. Later, the state agreed with the defense that this conversation violated Wolverton's constitutional rights and could not be used in the state's case in chief.

On September 22, 1989, Wolverton sent a note to the police asking to speak to Detective Smith, one of the detectives assigned to the case. On September 26, Detective Smith met with Wolverton, who waived his rights after they were read to him. During the ensuing conversation Wolverton continued to deny committing the crimes. At trial, however, Wolverton asserted that he had an affair with D.R. shortly before September 1. He also claimed that she had tried to involve him in an insurance fraud scheme and was trying to frame him for the rape, robberies and kidnapping. He also said that he was in Boise County the day of the rape.

At trial, the prosecutor asked Wolverton about the fact that he had not told the police earlier about his alleged affair with D.R. Wolverton's counsel moved for a mistrial, asserting that the prosecutor had impermissibly commented on Wolverton's right to remain silent. The court denied the motion. As noted, Wolverton was found guilty by the jury and was sentenced to concurrent life terms for the offenses, plus fifteen years on each charge for using a firearm during the commission of the crimes, and with a fixed period of confinement of twenty-five years as part of each sentence.

### Refusal to Grant a Mistrial was not Error

■ Wolverton asserts that the court erred when it failed to grant a mistrial following his motion objecting to the prosecutor's statements that he had not told the police he previously had an alleged affair with D.R. The state maintains that the comment was proper and consistent with Wolverton's right to remain silent. We agree with the state.

Wolverton's defense to the charges against him was that he was in Boise County when D.R. was raped. Apparently, before trial, Wolverton also told Sergeant Dale Woodcook that he had an affair with D.R. before September 1 and that she was trying to frame him for the crimes. At trial, during cross-examination, the prose-

cutor questioned Wolverton about this new information:

Q: And on September 27th of 1989, isn't it true that you talked with Detective Ken Smith at the Law Enforcement Building?

A: Yes.

Q: And in fact you initiated that, isn't that true? You sent a note to Detective Smith that you wanted to talk to him?

A: Yes.

Q: Isn't it true that in your whole conversation you had with Detective Ken Smith, that you never mentioned to him that you knew the victim in this case ... and that you had a sexual relationship with her?

A: I didn't want him to know. My attorney needed to know all that.

Q: You didn't want the police to know that you knew the victim and you had an affair with her?

A: They could go to my attorney and find out.

Q: You didn't want the police to know that a woman was framing you for kidnapping, rape, and robbery?

A: That was through my attorney.

Q: So your testimony is you told the attorney the whole time, months, and months, and months ago that you were having an affair with [D.R.]?

A: Right at first I didn't, but right after—I don't know, a couple of weeks after that I did.

.    .    .    .    .

Q: So the first time you ever saw fit to tell [the police] or anyone ... that you had any kind of—whatever—with the victim ... was when you told Sergeant Dale Woodcook that in March of this year?

A: I think so.

▆▆▆ An arrested person who has been advised of his constitutional rights as described in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), cannot have his post-arrest silence used against him to raise an inference of guilt or to impeach the defendant's testimony. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Gooding*, 110 Idaho 856, 719 P.2d 405 (Ct.App.1986). Using post-arrest silence in that way is fundamental error. *Id.* However, if the defendant waives his right to remain silent, it is permissible to cross-examine the defendant regarding inconsistencies with his testimony at trial. *Doyle, supra; State v. Rodgers*, 119 Idaho 1066, 812 P.2d 1227 (Ct.App.1990), *affirmed,* 119 Idaho 1047, 812 P.2d 1208 (1991). This proposition was discussed in *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), in which the defendant had been charged with murder after he was arrested while driving a stolen car belonging to the murder victim. There, the prosecutor asked questions about the defendant's inconsistent stories, which could be construed as references to his silence. In one instance, the prosecutor asked "Don't you think its rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got the car?" *Anderson*, 447 U.S. at 406, 100 S.Ct. at 2181. The Supreme Court held that the prosecutor's questions were proper. The Court stated that

Doyle [v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976),] bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. [Citations omitted.]

.    .    .    .    .

[Here,] [t]he questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.

We conclude that Doyle does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But Doyle does not require any such

formalistic understanding of "silence," and we find no reason to adopt such a view in this case.

*Anderson,* 447 U.S. at 408–09, 100 S.Ct. at 2182. This Court followed *Anderson* in *State v. Rodgers, supra,* in which the defendant had spoken with the police after his arrest and a waiver of his rights under *Miranda.* During cross-examination, the prosecutor asked "Have you ever told any police officers the story you have told the jury this morning?" This Court held that the question was proper because it fairly inquired about the inconsistency between Rodgers' voluntary statements to the police during the investigation and his testimony at trial. *Id.*

In the case at hand, Wolverton had requested to see Detective Smith and in the discussion which followed on September 26, he waived his right to remain silent. While conversing with the detective, Wolverton denied any knowledge of the crimes and referred to the victim as "this such and such lady," a term which can be construed to contradict his in-court assertion that he had an affair with D.R. and, one assumes, would know her name. In view of Wolverton's inconsistent positions regarding his knowledge of D.R., we find the prosecutor's questions fall within the rule stated in *Anderson* and *Rodgers* and did not impermissibly infringe on Wolverton's exercise of his right to remain silent.

### Psychologist's Letter in the Presentence Report

At sentencing, the court had for its reference Wolverton's presentence investigation report. Included in the report was a letter from D.R.'s psychologist describing the effect the crimes had on D.R. and her family. The psychologist opined that one of the effects of the crimes was the destruction of D.R.'s sense of security and, to help restore it, Wolverton should be incarcerated for life. Wolverton's motion to strike the letter was denied. On appeal, he objects on the grounds that the letter violated his right to confront his accusers, was unreliable hearsay, was self-serving and conclusory and contained biased information be-

cause the prosecutor had referred D.R. to that psychologist. We find no error.

First, we point out that the letter has nothing to do with Wolverton's conviction. Our concern is with the weight the court may have given the letter in determining appropriate sentences. It is well established that the judge may consider a wide range of relevant evidence when evaluating the appropriate sentence for a defendant. *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986), *after remand, State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990). Also, the sixth amendment does not require that a defendant have the opportunity to confront and cross-examine adverse witnesses in his sentencing proceedings. *Sivak, supra.* Further, I.C.R. 32(e) authorizes the use of hearsay information in a presentence report so long as the defendant is given an opportunity to present favorable information and to explain or rebut the adverse information. I.C.R. 32(e); *State v. Eubank,* 114 Idaho 635, 759 P.2d 926 (Ct.App.1988); *State v. Sensenig,* 110 Idaho 83, 714 P.2d 52 (Ct.App.1985). Hearsay information in a report must be disregarded if there is no reasonable basis to deem the information reliable or if the information is the product of conjecture and speculation. I.C.R. 32(e); *Eubank, supra.*

Criminal Rule 32 governs information in a presentence report that is by or about the defendant. Statements by psychologists are described only from the perspective of a psychologist's evaluation of the defendant, not the victim. As the state points out, there is no explicit prohibition in the rule against a psychologist's letter regarding the effect of the crime on the victim, or against a psychologist's comment as to sentencing. However, although a presentence report may recommend incarceration, the report "should not contain specific recommendations concerning the length of incarceration." I.C.R. 32(c).

Our research indicates that the cases dealing with hearsay in a presentence report generally concern material written about the defendants, not the victims. The issues in those cases primarily address whether a particular defendant had a

chance to confront the speaker or rebut the information provided. *See State v. Moore,* 93 Idaho 14, 454 P.2d 51 (1969); *State v. Ballard,* 93 Idaho 355, 461 P.2d 250 (1969). However, we have found one case, *State v. Ritsch,* 232 Neb. 407, 440 N.W.2d 689 (1989), in which a letter from the victim's psychologist was included in the presentence report. There, the defendant challenged the sentencing court's finding that the letter was properly included. The court noted that the nature of a presentence investigation report requires the sentencing judge to use hearsay information and that the judge has broad discretion in the source and type of information considered when determining the sentence to be imposed. *Ritsch,* 440 N.W.2d at 691. The court stated that the defendant had an opportunity to object to the letter in the presentence report and to rebut the information, but he did not do so. *Id.* The court stated that because the presentence report has nothing to do with the issue of guilt, "the rules governing due process with respect to the admissibility of evidence are not the same in a presentence hearing as in a trial in which guilt or innocence is the issue." *Id.* Although the court found no showing in the record that the sentencing judge considered the items in the investigative report, the court stated that "we do not believe it is error if he did so." *Id.*

In the present case, the judge did consider the psychologist's letter when sentencing Wolverton. The judge stated that

> [the psychologist] has analyzed [D.R.], and while I realize [the psychologist] has nothing to do with the crime, she does have a certain amount of effect as to the effect upon [D.R.]. She says 'She's experiencing frequent flashbacks to the initial assault of rape,' which I gather is similar to a Vietnamese war syndrome. And she goes into the significant effects upon the husband and the children of the victim. I guess anybody could expect that kind of effect upon a person from the traumatic situation [surrounding the events of the crimes].

However, the judge's comments do not reflect what weight, if any, he gave to the psychologist's recommendation of a life sentence.

We conclude that the court did not err when it refused to strike the letter from the presentence report. The judge was to consider a wide range of information at sentencing. The letter was merely one straw in a larger bundle of information that the court could properly consider. Wolverton had a chance to object to the letter and he did object. Further, there is no indication that the judge would have prohibited him from presenting his evaluation of the effect of the crimes on D.R. and her family, if he had chosen to do so. Without a clearer showing that the district court was improperly influenced by the psychologist's report and gave undue consideration to the psychologist's recommendation, we must presume that the district court performed its sentencing function with regularity and consistent with the standards stated in I.C.R. 32. *Freeman v. Comm. of Pardons and Paroles,* 119 Idaho 692, 809 P.2d 1171 (Ct.App.1991).

### The Sentence is Reasonable

■ Wolverton asserts that the court imposed an excessively harsh sentence when it sentenced him to concurrent life terms plus fifteen years, with a minimum of twenty-five years in prison on each charge. Wolverton contends that his sentence is longer than necessary to achieve the goals of sentencing and that the court did not properly consider those goals upon imposition of the sentences.

■ Sentencing is left to the discretion of the trial court, and a sentence imposed within the limits prescribed by statute ordinarily will not be considered an abuse of discretion. *State v. Hedger,* 115 Idaho 598, 768 P.2d 1331 (1989); *State v. Nice,* 103 Idaho 89, 645 P.2d 323 (1982). However, a sentence may reveal an abuse of discretion if it is shown to be unreasonable on the facts of the case. *Id.* A sentence is reasonable if it appears to accomplish the objective of protecting the good order of society and is imposed to achieve any or all of the related goals of deterrence, rehabilita-

tion or retribution. *State v. Toohill,* 103 Idaho 565, 650 P.2d 707 (Ct.App.1982). A sentence of confinement that is longer than necessary to serve these goals is unreasonable. *Id.* When reviewing a sentence, we examine the facts in the record independently and focus on the nature of the offense and the character of the offender. *State v. Reinke,* 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982).

Wolverton's sentences are within statutory guidelines. By itself, a conviction for first degree kidnapping mandates a life sentence. *See* I.C. § 18–4504; *see also State v. Nellsch,* 110 Idaho 594, 716 P.2d 1366 (Ct.App.1986). Wolverton's other crimes are specified by statute to include the possibility of life imprisonment. *See* I.C. §§ 18–6104 (rape), 18–6503 (robbery). Also, a fifteen-year period of incarceration for use of a firearm in a crime is within the statutory maximum. *See* I.C. § 19–2520. Furthermore, the court could have—but did not—order the sentences to be served consecutively. I.C. § 18–308; *State v. Thomas,* 98 Idaho 623, 570 P.2d 860 (1977); *State v. Lloyd,* 104 Idaho 397, 659 P.2d 151 (Ct. App.1983).

However, Wolverton argues that the sentence is unreasonable because at sentencing the court did not address all of the appropriate goals of punishment and instead focused only on protecting society. We note that a sentencing judge is not required to check off or recite each of the sentencing criteria when pronouncing a sentence. *State v. Morris,* 116 Idaho 16, 773 P.2d 284 (Ct.App.1989). The primary objective in sentencing is the protection of the good order of society. *See State v. Mahoney,* 107 Idaho 190, 687 P.2d 580 (Ct. App.1984); *Toohill, supra.* A sentence is reasonable if it appears to accomplish this objective and is imposed to achieve *any* of the related goals of deterrence, rehabilitation or retribution. *Toohill, supra.* A sentence of incarceration may be imposed to minimize the risk of recurrence of a defendant's criminal conduct. *Id.*

Here, the court clearly focused on the goals of deterrence and retribution and imposed a sentence to deter Wolverton from repeating his crimes. The jury found Wolverton guilty of committing very violent acts that appeared to have been planned in advance. D.R. testified that Wolverton had tried to enter her home with the same ruse a week before she was abducted, but was dissuaded by one of her little girls. Ultimately, he took D.R. from her home after threatening her with a gun and harm to her daughter. He drove her, bound with duct tape, into the nearby desert, cut her clothes off with a knife, raped her, and left her bound, naked and alone in the summer heat. The district judge stated that "There's no question if you did ... [the crimes], I have to keep you away from society for such a sufficient time that you will never, never, injure anyone again." When making this comment, the judge had for reference Wolverton's presentence report, wherein the investigator observed that, based on the violence and gravity of the crimes, Wolverton was an overt menace to society and should be incarcerated so he could not repeat his actions.

Although the court imposed a lengthy sentence, it did not impose the maximums allowed by the relevant statutes. The court specified that the sentences were to run concurrently and fixed a minimum term of twenty-five years. As noted, the court could have imposed consecutive terms, or fixed terms of life, which would still be within the statutory maximums. The judge stated that he did not impose the maximum sentence because "I don't think that a person should be put away forever because I always think ... that someday somewhere maybe this can be handled or cured." The structure of the sentences indicates that the judge gave some consideration to the defendant's potential for rehabilitation. *See Toohill; State v. Adams,* 106 Idaho 309, 678 P.2d 101 (Ct.App.1984). For the foregoing reasons, we hold that the district court did not abuse its discretion when it imposed Wolverton's sentences.

### Conclusion

The district court did not err when it denied Wolverton's motion for a mistrial.

The prosecutor's comment did not infringe on Wolverton's right to remain silent, but was a permissible inquiry into his inconsistent positions regarding his knowledge of D.R. Further, the court did not err when it failed to strike the letter by D.R.'s psychologist from the presentence report. The sentencing judge was to consider a wide range of information in determining the sentences, and the psychologist's letter was within that range. Finally, we conclude that the sentences imposed were not an abuse of the court's discretion.

The judgment of conviction and sentences are affirmed.

SWANSTROM, J., and BENGTSON, J., Pro Tem., concur.